**GUTRIDE SAFIER LLP**
SETH A. SAFIER (State Bar No. 197427)
seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
marie@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

Attorneys for Petitioner

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RYAN USSERY, an individual, on behalf of himself, the general public, and those similarly situated | CASE NO. |
| Petitioner, | PETITION TO CONFIRM ARBITRATION AWARD |
| v. | |
| FRANCHISE WORLD HEADQUARTERS, LLC, | |
| Respondent. | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Petition to Confirm Arbitration Award

**INTRODUCTION**

1.    Petitioner Ryan Ussery, by and through his undersigned counsel, brings this action to confirm an arbitral award against Respondent Franchise World Headquarters, LLC ("Subway" or "Respondent") pursuant to Section 9 of the Federal Arbitration Act, 9 U.S.C. § 9. The arbitral award was made in the San Francisco office of the American Arbitration Association.

2.    For background, Petitioner's underlying claims concern Respondent's egregious privacy violation and breach of consumer trust in blatant violation of California law. Respondent owns and operates a website, subway.com (the "Website"), which allows visitors to, among other things, search for restaurant locations, view menu options, and place orders. Like most internet websites, Respondent designed the Website to include resources and programming scripts from third parties that enable those parties to place cookies and other similar tracking technologies on visitors' browsers and devices and/or transmit cookies along with user data.

3.    Unlike many internet websites, however, Respondent's Website purports to offer all visiting consumers the choice to browse the Website without being tracked, followed, and targeted by third party data brokers and advertisers. The Website does this by displaying a pop-up cookie consent banner to Website visitors, which informs visitors that "By clicking 'Accept All Cookies,' you agree to the storing of cookies on your device to enhance site navigation, analyze site usage, and assist in our marketing efforts." Rather than clicking "Accept All Cookies," Website visitors can click the "Cookie Settings" button to adjust their settings. An exemplar of Respondent's initial pop-up cookie banner on the Website, from 2023, is included below:



4.    Users who click the "Cookie Settings" button are provided the opportunity to adjust their cookie settings in the "Privacy Preference Center" window to "choose not to allow some types of cookies" as shown in the following screenshots from 2023:

Petition to Confirm Arbitration Award



5.      Many of the millions of visitors to Respondent's Website, including Petitioner, did just that – they chose to adjust "Cookie Settings" in the popup banner, and rejected all cookies that were not "Strictly Necessary," including "Performance Cookies," "Functional Cookies," and "Analytics Cookies" in the Privacy Preference Center, and proceeded to browse the Website. Unfortunately, Respondent's privacy promises were outright lies, designed to lull users into a false sense of security. Unbeknownst to the users, and contrary to their express rejection of all performance, functional, and analytics cookies, Respondent nonetheless caused such cookies to be stored on the visitors' devices. In doing so, Respondent caused the transmission of users' personal data to undisclosed third parties, contrary to Respondent's representations.

6.      Many of the third-party cookies that Respondent wrongfully caused to be placed on Petitioner's and other consumers' devices are designed to track consumers' behavior across websites for marketing purposes. These third-party cookies can enable third parties to track and collect data in real time regarding Website visitors' behaviors and communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. Third parties analyze and aggregate this user data across websites and time for their own purposes and financial gain, including,

Petition to Confirm Arbitration Award

creating consumer profiles containing detailed information about a consumer's behavior,

preferences, and demographics; creating audience segments based on shared traits; and

performing targeted advertising and marketing analytics. Further, the third parties share user data

and/or user profiles to unknown parties to further their financial gain. This type of tracking and

data sharing is exactly what Petitioner and the other consumers who rejected all non-strictly

necessary cookies sought to avoid. In disregarding Petitioner and the Website visitors' express

refusal to consent to such cookies, Respondent violated state statutes and its common law duties

to Petitioner and those Website visitors.

7.     Prior to asserting claims on behalf of himself and a class of similarly harmed

individuals, Petitioner obtained an arbitral award finding that Petitioner is not subject to

Respondent's arbitration and class action waiver provisions in the Website's Terms of Service.

Petitioner now seeks to confirm that arbitral award so that he can pursue class claims against

Respondent for its breach of consumer trust and wanton privacy violations.

## PARTIES

8.     Petitioner Ryan Ussery is, and at all times alleged herein was, an individual and a

resident of Bakersfield, California. Petitioner intends to remain in California and makes his

permanent home there.

9.     Respondent Franchise World Headquarters, LLC is a Connecticut corporation with

its principal place of business in Milford, Connecticut. Subway has substantial contacts with and

receives substantial benefits and income from California and throughout the United States.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1332 because there is complete diversity of citizenship between Petitioner and Respondent, and

the amount in controversy (that is, the value of the arbitral award), exclusive of interest and costs,

exceeds $75,000.

11.    As set forth in the arbitral award (*see* Exhibit A), Petitioner is not subject to

Respondent's Website Terms of Service. Petitioner thus may assert claims in court on behalf of a

putative class, for Respondent's privacy violations, misrepresentations, unjust enrichment, and

trespass to chattels. Such a class action would seek injunctive relief as well as statutory damages of $5,000 *per violation* (and there were numerous violations, occurring each time Respondent caused the placement or transmission of third-party cookies on a Website visitor's device or browser after that person had declined such cookies on Respondent's Website), punitive damages, compensatory damages and/or restitution. Accordingly, the value of the award—finding that Petitioner is not limited to an individual arbitration—exceeds $75,000.

12.     This Court has personal jurisdiction over Respondent for the limited purpose of confirming the arbitration award because Respondent agreed to arbitrate in San Francisco, California, and fully participated in the arbitration in San Francisco, thereby consenting to jurisdiction in California and purposefully availing itself of the privilege of conducting activities (and, in particular, litigating the issues decided in the award) in California. This petition arises out of Respondent's arbitration activities in California, and it is reasonable for the Court to exercise jurisdiction over Respondent for purposes of confirming the award.

13.     In addition, Respondent regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and services provided to persons in the State of California. Respondent has engaged, and continues to engage, in substantial and continuous business practices in the State of California. California's long-arm statute permits the exercise of jurisdiction to the limits of due process. *See* Cal. Civ. Proc. Code § 410.10.

14.     Venue is proper in this District pursuant to 9 U.S.C.S. § 9, which provides that "[i]f no court is specified in the agreement of the parties, then such application may be made to the United States court in and for the district within which such award was made." Here, the parties agreed to arbitrate gateway issues of arbitrability in San Francisco, there was no pre-dispute agreement between the parties specifying where the award must be confirmed, and the arbitration was held and the award was made in the San Francisco office of the American Arbitration Association.

15.     Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events (that is, the arbitration) giving rise to this Petition occurred within this District.

16.     Petitioner accordingly alleges that jurisdiction and venue are proper in this Court.

## **LEGAL STANDARD**

17.     Confirmation of an arbitration award "is a summary proceeding that converts a final arbitration award into a judgment of the court." *Ministry of Def. & Support v. Cubic Def. Sys.*, 665 F.3d 1091, 1094 n.1 (9th Cir. 2011); *accord Int'l Petroleum Prods. & Additives Co. v. Black Gold, S.A.R.L.*, 418 F. Supp. 3d 481, 487 (N.D. Cal. 2019). Judicial review of an arbitration award, including on arbitrability issues, is both limited and highly deferential. *PowerAgent Inc. v. Elec. Data Sys. Corp.*, 358 F.3d 1187, 1193 (9th Cir. 2004). "Neither erroneous legal conclusions nor unsubstantiated factual findings justify federal court review" of an arbitration award under the Federal Arbitration Act ("FAA"). *Kyocera Corp. v. Prudential-Bache T Servs.*, 341 F.3d 987, 994 (9th Cir. 2003) (en banc).

18.     Under 9 U.S.C. § 10(a), there are only four, extremely limited grounds to vacate an arbitration award:

- where the award was procured by corruption, fraud, or undue means;

- where there was evident partiality or corruption in the arbitrators, or either of them;

- where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

- where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

19.     In addition, the "burden of establishing grounds for vacating an arbitration award is on the party seeking [vacatur]." *U.S. Life Ins. Co. v. Superior Nat'l Ins. Co.*, 591 F.3d 1167, 1173 (9th Cir. 2010).

## SUBSTANTIVE ALLEGATIONS

20.     On December 18, 2023, Petitioner filed a demand for arbitration in San Francisco with the American Arbitration Association. Exhibit B.

21.     Arbitrator Diana Kruze was assigned as the arbitrator.

22.     Following an initial conference, the Arbitrator ordered briefing regarding his jurisdiction and arbitrability. *See* Exhibit A.

23.     After receiving briefing and supporting evidence from the parties, the Arbitrator issued a final order/award, dated November 26, 2024, concluding: (a) Petitioner did not waive his right to challenge arbitrability; (b) Petitioner did not manifest consent to the agreement to arbitrate; (c) Petitioner is not estopped from challenging arbitrability of the dispute; and (d) Petitioner is not bound by the arbitration agreement. Exhibit A.

24.     The AAA subsequently issued a closing letter, dated December 26, 2024, confirming that it had closed the arbitration as dismissed. Exhibit C.

25.     The FAA provides that a court "must" confirm an arbitration award if any party to the arbitration applies for an order confirming the award within one year after the award is made, "unless the award is vacated, modified, or corrected." 9 U.S.C. § 9.

26.     The award was not procured by corruption, fraud, or undue means.

27.     There was no evident partiality or corruption in the arbitrator.

28.     The arbitrator was not guilty of any misconduct in refusing to postpone a hearing, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior prejudicial to the rights of Respondent.

29.     The arbitrator did not exceed her powers, or so imperfectly execute them that a mutual, final, and definite award upon the subject matter submitted was not made.

30.     Because the award has not been vacated and there is no ground to vacate the award, it must be confirmed.

1

## **PRAYER FOR RELIEF**

2      WHEREFORE, Petitioner respectfully requests that the Court confirm the arbitral award,

3   and provide Petitioner with any further relief as the Court deems proper.

4      Dated:    February 25, 2025                **GUTRIDE SAFIER LLP**

5                                                */s/Seth A. Safier/s/*
                                                Seth A. Safier, Esq.
6                                                100 Pine Street, Suite 1250
                                                San Francisco, CA 94111
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Petition to Confirm Arbitration Award

# EXHIBIT A



## ORDER REGARDING JURISDICTION AND ARBITRABILITY

Case Number: 01-23-0005-8490

*Ryan Ussery*
*-vs-*
*Franchise World Headquarters, LLC*

### Introduction

In his First Amended Complaint and Demand for Arbitration, Claimant Ryan Ussery ("Claimant" or "Ussery") alleges that he visited Respondent Franchise World Headquarters, LLC's ("Respondent") website, interacted with Respondent's website cookie banner, and rejected all performance, functional, and analytics cookies.  Notwithstanding his rejection of these cookies, Claimant alleges that Respondent caused the transmission of broad swaths of data about Claimant to undisclosed third parties.  Ussery claims that cookies from multiple other sites (such as "The Trade Desk (adsrvr.org), Google/DoubleClick, Quantum Metric, Snapchat, Twitter, and TikTok") launched thereafter.  Claimant alleges that Respondent's conduct violates his privacy rights, the California Comprehensive Computer Data Access and Fraud Act, the California Unfair Competition Law, the Consumers Legal Remedies Act, and other laws.  Claimant further alleges breach of contract and misrepresentation.

On July 25, 2024, pursuant to the scheduling order entered in this case, Claimant filed a dispositive motion with respect to jurisdiction (the "Motion"), arguing that the arbitration provision contained in Respondent's Terms of Service is inapplicable and unenforceable.  While the Motion was pending, the Arbitrator allowed Respondent to take a limited scope deposition of the Claimant with respect to arbitrability issues only.  The parties submitted supplemental briefing following Claimant's deposition.

On November 15, 2024, the Arbitrator conducted a hearing on the Motion.  Andreas Moffett appeared for Claimant.  Rebecca Guyon appeared for Respondent.

After hearing oral argument and considering the facts and law presented in the parties' briefs, the Arbitrator GRANTS Claimant's Motion, consistent with the following order.

## Discussion

### A. Jurisdiction and Arbitrability

Claimant contends that he did not consent to having his claims arbitrated because he did not assent to Respondent's Terms of Service. In its Opposition, Respondent does not contend that Claimant affirmatively agreed to the Terms of Service via its website. Instead, Respondent contends that Claimant waived his rights and is estopped from contesting arbitrability because he consented to this Tribunal's jurisdiction by filing this arbitration.

"[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of America v. Warrior and Gulf Navigation Company,* 363 U.S. 774, 582 (1960); *see also AT&T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 649 (1986). An agreement to arbitrate "need not be express;" "it may [also] be implied from the conduct of the parties." *Fortune, Alsweet Eldridge, Inc. v. Daniel*, 724 F.2d 1355, 1356 (9th Cir. 1983).[1]

### 1. Waiver

Respondent first argues that Claimant waived his right to contest jurisdiction by filing his Demand with the AAA, thereby affirmatively consenting to arbitrability.

Waiver is "the intentional relinquishment of a known right, [and] can arise either expressly or by conduct inconsistent with an intent to enforce the right." *Wald v. Chicago Shippers Ass'n*, 175 Ill. App. 3d 607, 621 (1988) (party waived contractual right by his "failure to take action, other than verbally informing defendants of their alleged breaches" because his conduct was "inconsistent with an intent by him to enforce his rights"); *Roesch v. De Mota* (1944) 24 Cal.2d 563, 572.

Respondent cites the Ninth Circuit's decision in *Ngheim* for the proposition that the "voluntary initiation of arbitration" is a "waiver of any objection" to arbitrability. *Nghiem v. NEC Elec.*, 25 F.3d

---

[1] "When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Respondent contends that the Arbitrator should apply Illinois law (as that is where it contends Claimant was physically located when he visited the website), while Claimant argues that California law applies. As the result is the same under either choice of law, the Arbitrator need not decide the issue.

1437, 1440 (1994). In *Nghiem*, the party objecting to jurisdiction initiated the arbitration, attended the hearings with representation, presented evidence at a final evidentiary hearing, and submitted a closing brief of fifty pages. *Id.* The court held that "[o]nce a claimant submits to the authority of the arbitrator **and pursues arbitration**, he cannot suddenly change his mind and assert lack of authority." *Id.* (emphasis added). Notably, unlike here, Ngheim did not raise the jurisdictional issue at the outset (or even the middle) of the proceedings.

As the Ninth Circuit subsequently clarified *en banc* in *Nagrampa*, "waiver turns not on the extent to which the party participates in the arbitration, but [also] on whether the party objects to arbitrability during—and not only after—arbitration." *Gustin v. Kleen Concepts LLC*, No. CV-22-00525-PHX-DLR, 2022 U.S. Dist. LEXIS 216875, at *7 n.1 (D. Ariz. Nov. 30, 2022); *Nagrampa v. MailCoups, Inc*., 469 F.3d 1257, 1277 (9th Cir. 2006).

In *Nagrampa*, the opposing party argued that Nagrampa "voluntarily participat[ed] in arbitration proceedings . . . without objecting to the arbitration" and hence waived her right to challenge the arbitrability of the dispute. 469 F.3d at 1277. The Ninth Circuit disagreed, noting that Nagrampa had "continuously challenged" the validity of the arbitration provision "[t]hroughout the course of these proceedings - before the AAA, the district court, and on appeal." *Id*. at 1278. Like here, Nagrampa expressly objected to the arbitrator's jurisdiction in both her original responsive filing and at the preliminary hearing. *Id*. The court found Nagrampa's filing of a counterclaim, discovery requests and minimal participation in various hearings did not amount to an intentional relinquishment or abandonment of her right to object to arbitration. *Id*. at 1279.

Similarly here, Claimant did not intentionally waive his right to contest arbitrability. Quite the opposite, it is undisputed that, in the parties' pre-filing communications, Claimant contended that he was not bound by any arbitration agreement. Moreover, on the first page of both Claimant's Arbitration Demand and First Amended Demand, Claimant expressly stated that he filed his "Arbitration Demand without waiver of any right or argument, including without limitation, that Claimant did not assent to Respondent's arbitration agreement[.]" The arbitrability issue was then explicitly raised again during the parties' first formal appearance in front of the Arbitrator. At the preliminary hearing on July 8, 2024, Ussery's counsel again contested jurisdiction and the arbitrability of the underlying dispute. In fact, the

Arbitrator has a distinct memory that this issue was the very first thing that came out of counsel's mouth (excluding, of course, his name). At the preliminary hearing, the Arbitrator permitted Claimant to file a dispositive motion contesting arbitrability, noting that "it involves a potentially case dispositive legal issue that may dispose of or narrow the issues of the case."

Moreover, Ussery's participation in this case has been minimal. All Claimant has done is filed a Demand (including an express objection to arbitrability), appeared at the preliminary hearing (where he raised his jurisdictional challenge), filed this Motion on arbitrability, and defended a deposition ordered solely to explore arbitrability issues. This conduct does not amount to a waiver, and is a far cry from either the affirmative conduct or the silent manifestation of assent that courts finding waiver have relied upon.

In Ussery's case, this is not a situation where a disgruntled party complains about jurisdiction only after an adverse ruling. *Compare Fortune, Alsweet & Eldridge, Inc. v. Daniel*, 724 F.2d 1355, 1356 (9th Cir. 1983) ("we have long recognized a rule that a party may not submit a claim to arbitration and then challenge the authority of the arbitrator to act after receiving an unfavorable result"); *Roderick v. Mazzetti & Assocs.*, No. C 04-2436 MHP, 2004 U.S. Dist. LEXIS 22911, at *14, 15 n. 3 (N.D. Cal. Nov. 9, 2004) (arbitrability waived after the arbitrator issued adverse ruling). Nor is this a situation where a party's continued silence or active participation could be inferred or transmuted into assent. *Compare Nghiem*, 25 F.3d at 1440.

Tellingly, Respondent cites no authority where a court found waiver where the party continually objected to jurisdiction. Indeed, in every single case cited by the parties where a litigant filed its jurisdictional objection early, courts have consistently held that no waiver occurred. *See e.g.*, *Roughneck Concrete Drilling & Sawing Co. v. Plumbers' Pension Fund, Local 130*, 640 F.3d 761, 767 (7th Cir. 2011) (distinguishing *Nghiem* and finding no relinquishment of rights where Roughneck withdrew "its consent to arbitration before any substantive proceedings were conducted" and had a "compelling ground" to challenge arbitrator's authority); *Jacob v. First Collateral Servs.*, No. CV-07-1194-PHX-GMS, 2008 U.S. Dist. LEXIS 131002, at *16 n.3 (D. Ariz. Sep. 15, 2008) ("Unlike the cases in which waiver was found, Jacob objected to arbitrability near the outset of the dispute, never withdrew his objection, and did not proceed to arbitration on the merits of the contract claim."); *Pension Plan for*

*Pension Trust Fund v. Weldway Constr., Inc.*, 920 F. Supp. 2d 1034, 1048 (N.D. Cal 2013) (no waiver where plaintiffs objected to arbitration, never withdrew objection, and "participation was limited to procedural issues and actions necessary to preserve their rights").

Finally, the Arbitrator declines to impose a *per se* rule that the mere act of filing a claim in arbitration constitutes a waiver. As even the cases upon which Respondent relies clearly state, "not just any conduct in arbitration will result in waiver." *Garcia v. Amazon*, No. 2021 U.S. Dist. LEXIS 134403, *11 (N.D. Cal. May 25, 2021) ("the Ninth Circuit and courts therein have found no waiver despite a party's participation" where there "has been an immediate and ongoing objection to the arbitration"). Under Respondent's proposed rule, a claimant (or counterclaim respondent) could never contest jurisdiction. Where a party repeatedly objects to arbitrability, including in their first filing with the AAA, it cannot be said that they have intentionally relinquished or waived the right to contest that arbitrator's jurisdiction.

### 2. Estoppel

Second, Respondent contends that Claimant is estopped from raising arbitrability. Specifically, Respondent argues that "Ussery has derived a direct benefit under those same terms when he invoked them to pursue this arbitration."

The estoppel doctrine exists to prevent a litigant from unfairly receiving the benefit of a contract while at the same time repudiating what it believes to be a disadvantage in the contract, namely the contractual arbitration provision. *Gersten v. Intrinsic Techs.*, LLP, 442 F. Supp. 2d 573, 579 (2006); *see also Carwile v. Samsung Telecomms. Am., LLC*, No. CV 12-05660-CJC, 2013 U.S. Dist. LEXIS 185089, *4 (C.D. Cal. July 9, 2013); Cal. Evid. Code § 623 ("When a party has, by his own statement or conduct, intentionally and deliberately led another to believe a particular thing true and to act upon such belief, he is not, in any litigation arising out of such statement or conduct, permitted to contradict it.")

The Arbitrator finds estoppel inapplicable here. Ussery did not "invoke" the "direct benefit" of the Terms of Service. Unlike *Gersten* and *Carwile*, Ussery's complaint is not premised on rights given to him by the Terms of Service. *Compare Gersten*, 442 F. Supp. 2d at 579-80 (plaintiff was estopped from disputing arbitration clause in operating agreement based on affirmative assertion of claims for payments under and breach of fiduciary duty created by operating agreement); *Carwile*, 2013 U.S. Dist. LEXIS

185089 at *4 (warranty claim for broken phone premised on same contract as arbitration agreement). Instead, the gravamen of Claimant's fourteen causes of actions centers on violation of his independent privacy rights and consumer protection laws. The words "Terms of Service" do not appear once in Claimant's First Amended Demand. *Compare Gersten*, 442 F. Supp. 2d at 579-80 (repeated citation and reliance on operating agreement containing arbitration created estoppel). Indeed, only one of Ussery's fourteen causes of action – the breach of contract claim – arguably relates to the Terms of Service, but is facially focused on an alleged agreement created by the cookie banner itself and Respondent's privacy policies. Finally, Ussery directly challenged the Terms of Service's arbitration clause in both his Demand and First Amended Demand. Ussery did not trick Respondent into thinking that this claim was arbitrable, only to do a complete about-face later. As noted above, Ussery has repeatedly told Respondent that his claims belong in court, not arbitration. While Claimant's strategic move to file an arbitration demand was certainly an unorthodox one, this act alone does not create estoppel given the circumstances.

The Arbitrator concludes that she does not have a basis for jurisdiction over the underlying dispute.

### B. Sanctions Requests and Second Ussery Deposition

Both parties' counsel seek sanctions based on alleged misconduct during Ussery's arbitrability deposition. Claimant contends that Respondent treated Ussery's deposition as an *unlimited* discovery deposition, repeatedly badgered Ussery with questions outside the deposition's scope, threatened sanctions when Ussery's counsel objected to the unlimited scope of the questions, and had a non-California licensed attorney participate in the deposition. On its side, Respondent argues that Claimant's counsel repeatedly interfered with the deposition, improperly made lengthy speaking objections, and improperly instructed Ussery not to answer.

As the Arbitrator noted to both sides' counsel at the Motion hearing, the Arbitrator was displeased in reading the deposition transcript. She was especially concerned by repeated improper instructions not to answer, which clearly impeded the questioning attorney's ability to get a clear record.

However, having found no valid arbitration agreement, the Arbitrator finds that she has no jurisdiction to entertain either side's requests for sanctions. The Arbitrator also does not have the authority to order a second deposition of Ussery, as Respondent requests. Accordingly, both parties'

ancillary requests are denied for lack of jurisdiction.

## <u>Conclusion</u>

The Arbitrator GRANTS Claimant's Motion Regarding Arbitrability.  The Arbitrator declines to address the other requests for relief made by both parties (such as sanctions for deposition misconduct), having found that she lacks authority and jurisdiction over the underlying Claimant's claims here.

The AAA shall dismiss this proceeding, and shall proceed to administratively close this arbitration.

| 11/26/2024 | /s/ Diana Kruze |
|:---:|:---:|
| Date | Diana  Kruze, Arbitrator |

# EXHIBIT B

1  **GUTRIDE SAFIER LLP**
   Seth A. Safier (State Bar No. 197427)
2     seth@gutridesafier.com
   Marie A. McCrary (State Bar No. 262670)
3     marie@gutridesafier.com
   Todd Kennedy (State Bar No. 250267)
4     todd@gutridesafier.com
   Kali R. Backer (State Bar No. 342492)
5     kali@gutridesafier.com
   100 Pine Street, Suite 1250
6  San Francisco, CA 94111
   Telephone:  (415) 639-9090
7  Facsimile:  (415) 449-6469

8  *Attorneys for Claimant*

9              **AMERICAN ARBITRATION ASSOCIATION**

10              **SAN FRANCISCO REGIONAL OFFICE**

11 RYAN USSERY, an individual, on behalf of      Arbitration Case No.
   himself, the general public, and those similarly
12 situated,                                      **COMPLAINT AND DEMAND FOR
                                                  ARBITRATION**
13                        Claimant,

14        v.

15 FRANCHISE WORLD HEADQUARTERS,
   LLC,
16
                          Respondent.
17

18        Claimant Ryan Ussery ("Claimant") brings this action on behalf of himself, the general

19 public, and all others similarly situated against Franchise World Headquarters, LLC

20 ("Respondent" or "Subway").[1] Claimant's allegations are based upon information and belief and

21 upon investigation of Claimant's counsel, except for allegations specifically pertaining to

22 Claimant, which are based upon Claimant's personal knowledge.

23                              **INTRODUCTION**

24        1.      This Complaint and Arbitration Demand concerns an egregious privacy violation

25 and breach of consumer trust in blatant violation of California law. Respondent's website

26

27 ─────────────────────
   [1] Claimant files this Complaint and Arbitration Demand without waiver of any right or argument,
28 including without limitation, that Claimant did not assent to Respondent's arbitration agreement
   and/or that the purported arbitration agreement is unlawful and/or unenforceable.

(www.subway.com, hereinafter, the "Website") is configured to use a multitude of cookies to enable third parties to track users' activity and communications on the Website even after users reject such cookies. At least until it was put on notice of the allegations herein by Claimant, Respondent presented all visitors to the Website with a pop-up cookies banner that gave users the option to adjust "Cookie Settings" or "Accept All Cookies." Consistent with his typical practice, Claimant clicked on the Cookie Settings button and, in Respondent's "Privacy Preference Center," he adjusted the settings for the "Performance Cookies, Functional Cookies, and Analytics Cookies," indicating his choice and/or agreement to reject all such cookies (i.e. all performance, functional, and analytics cookies). Respondent's banner led Claimant, and those similarly situated, to believe that they declined or rejected *all performance, functional, and analytics cookies*. Hundreds of thousands of Website visitors did just that—they rejected performance, functional, and analytics Cookies and proceeded to browse the Website. But, unbeknownst to them, and contrary to the express rejection of all such cookies, Respondent nonetheless caused performance, functional, and analytics Cookies—both from Respondent and third parties with notorious privacy records, including The Trade Desk (adsrvr.org), Google/DoubleClick, Quantum Metric, Snapchat, Twitter, and TikTok—to be stored on the device and browser of Claimant and those similarly situated. In doing so, Respondent caused the transmission of extensive data about Claimant, and those similarly situated, to undisclosed third parties, contrary to Respondent's representations and Claimant's and other consumers' express directions.

2.    Many of the third-party cookies that Respondent wrongfully placed on Claimant's and other consumers' devices and browsers are designed to track consumers' behavior across websites for marketing purposes. They are invasive because they allow third parties to track and collect, among other things: the URLs being browsed by consumers as well as the referrer URL; webpage title; webpage keywords; buttons the consumers click; the exact date and time of the website visits; consumers' devices, browsers, and IP addresses; product page visits; and/or data entered by Claimant into forms on the Website.

3.      Respondent allowed these companies to access Claimant's and other consumers' communications with Respondent and enabled them to collect data on consumers for use for its own purposes, including building profiles of consumers' interests and targeting advertising to them. This type of monitoring and data sharing is exactly what the consumers who opted out sought to avoid. Despite receiving notice of consumers' declination of consent, Respondent defied it and Respondent violated privacy statutes, state consumer protection statutes, tort duties, and also breached contractual duties and the implied covenant of good faith and fair dealing with Claimant and those similarly situated.[2]

## PARTIES

4.      Claimant Ryan Ussery is, and was at all relevant times, an individual and resident of California. Claimant intends to remain in California and makes his permanent home there.

5.      Respondent Franchise World Headquarters, LLC is a Connecticut corporation with its principal place of business in Milford, Connecticut. It franchises the popular Subway brand sandwich restaurant.

## SUBSTANTIVE ALLEGATIONS

6.      Subway is a fast-food restaurant empire known for its sandwiches and related menu options. Subway owns and operates the Website at issue in this Complaint and Demand for Arbitration, which allows visitors to, among other things, search for restaurant locations, view menu options, and place orders.

7.      Subway chose to integrate the Website with cookies from third parties which, among other things, track users' behavior on the Website.

8.      Cookies are small text files that website servers can cause to be placed on an internet user's device when that user's browser interacts with the website through its servers. First-party cookies are those that are placed on the user's browser directly by the webserver with which the user is knowingly communicating (in this case, the Website). Third-party cookies are

---

[2] Claimant has not included class allegations in this Complaint and Demand but reserves the right to do so in an amended complaint once the Arbitrator has decided all threshold issues related to this Arbitration, including without limitation jurisdiction, scope, and applicability.

those that are set by other webservers (e.g. facebook.com, google.com, etc.). When a consumer visits the Website, both first-party cookies and third-party cookies are placed on the consumer's devices. All of this is caused by software code that Subway incorporates into its Website, or that Subway causes to be loaded. Because Subway controls the software code of its Website, it has complete control over whether first-party and third-party cookies are set on its users' devices.

9.       Third-party cookies, including those on the Website, are typically designed to enable companies to track and record an Internet user's communications with and activities on websites. Third-party cookies typically work in furtherance of data collection, analytics, behavior profiling, and targeted advertising.

10.      Cookies are the backbone of digital advertising. Because cookies enable third parties to track users' behavior across the Internet and correlate data collected to specific users, advertisers and purveyors of websites can gain deep understanding of users' behavioral traits and characteristics and target those users with advertisements tailored to their profiles.

11.      As a research director at the Electronic Frontier Foundation put it, third-party cookies allow these companies "to be a silent third-party watching whatever you're doing."[3]

12.      Every website is hosted by a server that sends and receives communications with Internet users and their web browsers to display web pages on users' devices.

13.      Users communicate with websites by sending HTTP requests, such as "GET" or "POST" requests. For example, when a user clicks on a hyperlink within a website, the user sends an HTTP request to the server hosting the website to which the user is sending the communication. The HTTP command tells the website server what information is being requested and instructs the website's server to send the information back to the user.

14.      When a website has third-party cookies, those cookies are simultaneously placed on the user's device and browser. This allows the third-party cookie company to track the Internet user's communications with the website and to correlate the user with data such as the

---

[3] Jefferson Graham, Facebook spies on us but not by recording our calls. Here's how the social network knows everything, USA Today (March 4, 2020 4:52 am), https://www.usatoday.com/story/tech/2020/03/04/facebook-not-recording-our-calls-but-has-other-ways-snoop/4795519002/.

URLs being browsed by the user; the webpage title; button clicks; and the date and time of the website visit.

**A.    Respondent' Cookie Banner Falsely Informed Consumers They May "Choose Not to Allow" Certain Types of Cookies.**

15.    When users visited the Website, a cookie pop up banner was immediately displayed to the user. As shown in the screenshot below, the banner stated that "By clicking 'Accept All Cookies', you agree to the storing of cookies on your device to enhance site navigation, analyze site usage, and assist in our marketing efforts." The banner provided users the opportunity to select "Cookie Settings" or "Accept All Cookies."



16.    Users, such as Claimant, who selected the "Cookie Settings" button were presented with the following screen depicted in the screenshot below. The screen represented to users, among other things, that Respondent "respect [users'] right to privacy" and that users could "choose not to allow some types of cookies[.]" The window then gives users the option to toggle-off/deselect/reject "Performance Cookies," "Functional Cookies," and "Analytics Cookies."



17.     In the Privacy Preference Center, Responded described the categories of cookies that users could reject as follows:

    a.  **Performance Cookies**: Cookies that "allow us to count visits and traffic source so we can measure and improve the performance of our site. They help us to know which pages are the most and least popular and see how visitors move around the site."

    b.  **Functional Cookies**: Cookies that "enable the website to provide enhanced functionality and personalization" and "may be set by us or third party providers" and,

    c.  **Analytics Cookie**s: Cookies that "may be set through out [the] site by [Respondent'] advertising partners. They may be used by those companies to build a profile of your interests and show you relevant ads on other sites."

18.     Respondent' cookie banner, inclusive of the Privacy Preference Center window, led Claimant, and those similarly situated, to believe that they could opt out of *all* performance, functional and analytics cookies, including third party cookies, and that their communications with Respondent would remain private and would not be shared with other third parties. Consumers also believed that by opting-out of performance, functional, and analytics cookies, Respondent would not store cookies on their devices that would analyze their site usage or assist in Respondent's advertising efforts. Those beliefs, however, were false.

19.     In truth, Respondent did not abide by their users' wishes. Even though Respondent received notice that certain users did not consent to the disclosure of their personal information, and the third-party cookies causing such disclosure, when they opted out of performance, functional and analytics cookies, Respondent nonetheless placed such cookies on all their Website users' devices—*even for those users who selected the "Cookie Settings" button and deselected performance, functional and analytics cookies.*

20.     In particular, when users selected the "Cookie Settings" button and subsequently opted out of performance, functional and analytics cookies, Respondent nonetheless continued to cause third-party cookie data to be transmitted to and from consumers' devices, including

cookies from The Trade Desk (adsrvr.org), Google/DoubleClick, Quantum Metric, Snapchat, Twitter, TikTok, and many others.

21.    The following screenshots show examples of the enormous number of third-party and other cookies that the Website placed, and which were subsequently utilized, after a user selected the "Cookies Settings" button and subsequently rejected and/or opted out of performance, functional, and analytics cookies:

**[Remainder of page intentionally left blank]**

COMPLAINT AND DEMAND FOR ARBITRATION



22.     Along with the cookie data, the Website causes a large amount of other data to be sent to third parties. This data includes, among other things: the URLs being browsed by consumers as well as the referrer URL; webpage title; webpage keywords; button clicks; the

exact date and time of the website visits; the IP address of consumers' devices; device and browser types; consumers' geolocation; product page visits; data consumers supply to the Website, such as data entered into forms on the Website, and, often, identifier data. The identifier data sent to the third party with this information allows that third party to correlate the data to the user or the user's device. As such, third parties can (and almost invariably do) use it to develop and enrich profiles on consumers like Claimant to target advertising to them.

23.    The cookies on the Website enable third parties, like ByteDance and TikTok, to link individual users and devices with data regarding specific browsing activity on the Website.

24.    The cookies that Respondent wrongfully placed on users' devices enabled third parties to track users' browsing history on the Website. Every time a user visited a new page on the Website after declining cookies, more data regarding users' browsing activity was sent to third parties, alongside the cookie data.

**B.    Third Parties Exploit Data Received from the Cookies on the Website.**

25.    The more webpages a user views on the Website, the more data third parties amass about the user. The third-party cookies that Respondent wrongfully allow to be stored on users' devices and browsers enable third parties to compile a vast repository of Claimant's browsing activity and to receive access to information that is otherwise unknowable. These third parties leverage the wrongfully-collected information to their advantage, using it to compile browsing histories and habits into personal profiles on consumers which are sold to advertisers to generate revenue and target advertising to users like Claimant. In particular, third-party cookies, such as those from the Website, allow third parties to draw inferences from information collected about users' browsing and search history on the Website to create profiles about consumers reflecting the consumer's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes.

26.    For example, DoubleClick (which is owned by Google) is the largest provider of Internet advertising. DoubleClick cookies, among other things, collect data about the user, such as user demographics and/or user behaviors, to create and update a profile of the user to fit the preferences of the particular user.

27.     Further, Subway causes the sharing of extensive information—including cookie data—with Quantum Metrics, which records users' mouse movements, keystrokes, and other detailed and sensitive information.

28.     The data that the third-party cookies collect is valuable to Respondent as well. Data about users' browsing history enables Respondent to spot patterns in users' behavior on the Website and their interests in, among other things, specific menu items and specials.

29.     Tracking cookies, which are included within as the "Analytics Cookies" Respondent falsely claimed that Claimant and other Website users could reject, are particularly useful for Respondent's advertising. For instance, if Respondent wanted to market new food products or menu options to users, Respondent could use the tracking cookies to monitor who visits the webpages that relate to similar food products or menu options likely to be of interest to its users.   The cookies also enable Subway to target online advertisements to users, by virtue of the cookie data, when they visit other websites, even those completely unrelated to Subway.

**C.     The Intercepted Data Is Valuable.**

30.     The information that the third-party cookie companies intercept, collect, and track about users through the third-party cookies Respondent causes to be placed on users' devices carries significant economic value. Legal scholars observe that "[p]ersonal information is an important currency in the new millennium." *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004). Indeed, "[t]he monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend." *Id*. "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id*.

31.     The value of the users' personal information provided to third parties through the cookies Respondent wrongfully placed can be quantified. For instance, in one study, researchers evaluated the value that 180 internet users placed on keeping personal data secure. Participants valued web browsing history at $52.00 per year. Similarly, they valued web search history at $57.00 per year.

**Revealed Value of Personal Data**

| | US$/Year |
|---|---|
| Your social security number / government ID | $240 |
| Credit card information | $150 |
| Digital communication history (chat logs, text messages, emails) | $59 |
| Web search history | $57 |
| Physical location history (your phone or car GPS records) | $55 |
| Web browsing history | $52 |
| Health history (medical records, diet, health routines) | $38 |
| Online advertising click history | $5.7 |
| Online purchasing history | $5.7 |
| Social Profile (hobbies, interests, religious and political views) | $4.6 |
| Contact information (phone number, email or mailing address) | $4.2 |
| Demographic information | $3.0 |

US$/Year, median value, n=180

32.     Similarly, the value of user-correlated web browsing history can be quantified because companies are willing to pay users for the exact type of data that the third parties here intercepted and collected—without permission—through the cookies on the Website. For example, Google Inc. had a panel called "Google Screenwise Trends" which, according to Google, is designed "to learn more about how everyday people use the Internet."

33.     As part of the program, Google had panelists add a browser extension that shares with Google the websites that users visit and how the panelist uses them. The panelists consented to Google tracking this information for one of a number of "gifts," including gift cards to retailers such as Barnes & Noble, Walmart, and Overstock.com.

34.     After three months, Google also agreed to pay panelists additional gift cards "for staying with" the panel. These gift cards, mostly valued at $5, demonstrated conclusively that internet industry participants understood the enormous value in internet users' browsing habits. Google subsequently chose to pay Screenwise users up to $3 per week to be tracked.

35.     Other platforms have appeared where consumers can and do directly monetize their own data. For instance, Killi is a data exchange platform that allows consumers to own and earn income from their data.[4] Similarly, BIGtoken "is a platform to own and earn from your data.

---

[4] https://killi.io/about-us/

COMPLAINT AND DEMAND FOR ARBITRATION

You can use the BIGtoken application to manage your digital data and identity and earn rewards when your data is purchased."[5]

36.     The Nielsen Company is another example. It has extended its reach to computers and mobile devices through the Nielsen Computer and Mobile Panel. By installing the application on your computer, phone, tablet, e-reader, or other mobile device, Nielsen tracks users' activity, enters users into sweepstakes with monetary benefits, and compensates users with points worth up to $50 per month.[6]

37.     Technology companies recognize the monetary value of users' sensitive, personal information insofar as they encourage users to install applications explicitly for the purpose of selling that information to technology companies in exchange for monetary benefits.[7]

38.     California's Consumer Privacy Act ("CCPA") recognizes that consumers' personal data is a property right. Not only does the CCPA prohibit covered businesses from discriminating against consumers who opt-out of data collection, the CCPA also expressly provides that: "[a] business may offer financial incentives, including payments to consumers as compensation, for the collection of personal information, the sale of personal information, or the deletion of personal information." Cal. Civ. Code § 1798.125(b)(1). The CCPA provides that, "[a] business shall not use financial incentive practices that are unjust, unreasonable, coercive, or usurious in nature." Cal. Civ. Code § 1798.125(b)(4).

---

[5] https://bigtoken.com/faq#general_0 ("Third-party applications and sites access BIGtoken to learn more about their consumers and earn revenue from data sales made through their platforms. Our BIG promise: all data acquisition is secure and transparent, with consumers made fully aware of how their data is used and who has access to it.").

[6] Kevin Mercandante, Ten Apps for Selling Your Data for Cash, Best Wallet Hacks (June 10, 2020), https://wallethacks.com/apps-for-selling-your-data/.

[7] Kari Paul, Google launches app that will pay users for their data, The Guardian (June 11, 2019), https://www.theguardian.com/technology/2019/jun/11/facebook-user-data-app-privacy-study; Saheli Roy Choudhury and Ryan Browne, Facebook pays teens to install an app that could collect all kinds of data, CNBC (Jan. 30, 2019), https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html; Jay Peters, Facebook will now pay you for your voice recordings, The Verge (Feb. 20, 2020), https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-prounnunciations-app.

39.    Through its false representations and unlawful data collection and dissemination, Respondent is unjustly enriching itself at the cost of consumer choice, when the consumer would otherwise have the ability to choose how they would monetize their data.

## CLAIMANT'S EXPERIENCES

40.    During the last year, Claimant Ussery visited the Website to view content available on the Website.

41.    When Claimant visited the Website, he was presented with a cookie banner and was given the option to click "the "Cookie Settings" button.

42.    Consistent with Claimant's typical practice, Claimant clicked on the "Cookie Settings" button and opted out of performance, functional, and analytics cookies, indicating his choice and/or agreement to reject all cookies except for "Strictly Necessary" cookies, which Claimant was unable to reject. Respondent's cookies banner and Privacy Preference Center led Claimant, and those similarly situated, to believe that they declined or rejected all performance, functional, and analytics cookies.

43.    Claimant believed that by opting out of performance, functional, and analytics Cookies, he would keep his communications with the Website private.

44.    By opting out/rejecting performance, functional, and analytics cookies, Claimant gave Respondent notice that he did not consent to the placement of such third-party cookies from the Website. In reliance on Respondent' representations and promises, only then did Claimant continue browsing the Website.

45.    Despite the fact that Claimant opted out/rejected performance, functional, and analytics cookies, unbeknownst to him, Respondent nonetheless continued to cause the placement of such third-party cookies, including those from The Trade Desk (adsrvr.org), Google/DoubleClick, Quantum Metric, Snapchat, Twitter, TikTok, and many others, on his device. In doing so, Respondent caused the transmission of private communications and data to third parties as Claimant browsed the Website.

46.    Respondent's representation that consumers could opt-out of performance, functional, and analytics cookies was untrue. Had Claimant known this fact, he would not have

used the Website. Moreover, Claimant reviewed the cookie banner and Privacy Preference Center prior to using the Website. Had Respondent disclosed that it would continue to cause third-party and other cookies to be stored on consumers' devices even when they choose to reject all such cookies, Claimant would have noticed it and would not have used the Website or, at a minimum, would have interacted with the Website differently.

47.    Claimant continues to desire to browse the Website and would like to browse other, similar websites that do not misrepresent that users can reject performance, functional, and analytics cookies. If the Website was reconfigured to honor users' request to reject all such cookies, Claimant would likely browse the Website again in the future but will not do so until then. Claimant regularly visits websites that feature content similar to that of the Website. Because Claimant does not know how the Website is configured, which can change over time, and cannot test whether the Website honors users' requests to reject performance, functional, and analytics cookies, Claimant will be unable to rely on Respondent' representations when browsing the Website in the future absent an injunction that prohibits Respondent from making misrepresentations on the Website.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Invasion of Privacy Under California's Constitution

48.    Claimant realleges and incorporates the paragraphs of this Complaint as if set forth herein.

49.    California's constitution creates a right to privacy, and further creates a right of action against private entities such as Respondent.

50.    The principal purpose of this constitutional right is to protect against unnecessary information gathering, use, and dissemination by public and private entities, including Respondent.

51.    Article I, Section 1 of the California Constitution provides:

"All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing,

---

- 15 -

and protecting property and pursuing and obtaining safety, happiness, and privacy."

52.    The phrase "and privacy" was added in 1972 after voters approved a proposed legislative constitutional amendment designated as Proposition 11. Proposition 11 was intended to curb businesses' control over the unauthorized collection and use of peoples' personal information, as the ballot argument stated:

> The right of privacy is the right to be left alone...It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us. Fundamental to our privacy is the ability to control circulation of personal information. This is essential to social relationships and personal freedom.[8]

53.    This amended constitutional provision addresses the concern over accelerating encroachment on personal freedom and security caused by increasing surveillance and data collection activity in contemporary society. Its proponents meant to afford individuals more measure of protection against this most modern threat to personal privacy:

> Computerization of records makes it possible to create 'cradle-to-grave' profiles of every American. At present there are no effective restraints on the information activities of government and business. This amendment creates a legal and enforceable right of privacy for every Californian.[9]

In recognizing these privacy rights, the California Constitution provides insight into and serves to define the nature of the reasonable expectation of privacy of an objectively reasonable California resident.

54.    To plead a California constitutional privacy claim, Claimant must show an invasion of (i) a legally protected privacy interest; (ii) where Claimant had a reasonable expectation of privacy in the circumstances; and (iii) conduct by Respondent constituting a serious invasion of privacy.

55.    Respondent has intruded upon the following legally protected privacy interests of Claimant: (i) the California Invasion of Privacy Act, as alleged herein; (ii) the California

---

[8] Ballot Pamp., Proposed Stats. & Amends. To Cal. Const. With Arguments to Voters. Gen. Election *26 (Nov. 7, 1972).
[9] *Id.*

Constitution, which guarantees Californians the right to privacy; (iii) the California Wiretap Acts as alleged herein; (iv) Cal. Penal Code § 484(a), which prohibits the knowing theft or defrauding of property "by any false or fraudulent representation or pretense;" and (v) Claimant's Fourth Amendment right to privacy. Claimant has a reasonable expectation of privacy in the conduct of his life, including his internet browsing activities and in the electronic communications and exchange of personal data with Respondent, since, among other things, Respondent affirmatively promised Claimant that he could opt-out of and/or reject performance, functional, and analytics cookies. Claimant directed his electronic devices to access the Website, and when he was presented with cookies banner on the Website, he reasonably expected that his rejection of performance, functional, and analytics cookies would be honored. That is, he reasonably believed that Respondent would not cause the placement of such cookies while he browsed the Website. Claimant also reasonably expected that, if he opted-out/rejected performance, functional, and analytics cookies, Respondent would not share his communications and data with third parties or collect such data itself. Claimant further reasonably expected that the Website would not cause his browser to store and send cookies and other data to third parties, which then used that data to track Claimant's activity, such as the URLs being browsed by Claimant as well as the referrer URL; webpage title; webpage keywords; the exact date and time of the Website visits; the IP address of Claimant's computer; product page visits; and/or data that Claimant supplied to the Website. Such information is "personal information" under California law, which defines personal information as including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement." Cal. Civ. Code § 1798.140.

56.     Respondent, in violation of Claimant's reasonable expectation of privacy, allowed third-party cookie companies to collect, track and compile his web browsing activity and communications. The data that Respondent allowed third parties to collect enabled third parties to assemble comprehensive profiles of Claimant's life. Those profiles are, and can be, used to further invade Claimant's privacy, by, *inter alia*, allowing third parties to learn intimate details of Claimant's life, and target him for advertising and other purposes, as described herein,

thereby harming Claimant through the abrogation of Claimant's autonomy and ability to control dissemination and use of his personal information.

57.    Respondent's actions constituted a serious invasion of privacy in that it invaded a zone of privacy protected by the Fourth Amendment—i.e., one's personal communications— and violated criminal laws on wiretapping and invasion of privacy. These acts constitute an egregious breach of social norms that is highly offensive.

58.    Respondent' intrusion into Claimant's privacy was also highly offensive to a reasonable person in that Respondent violated criminal and civil laws designed to protect individual privacy and against theft.

59.    The surreptitious and unauthorized disclosure of the internet activity and communications of thousands, if not millions, of consumers constitutes an egregious breach of social norms.

60.    Respondent lacked a legitimate business interest in causing the placement of third-party cookies that allowed third-party companies, including marketing, advertising, and social media companies, to track, intercept, receive, and collect data about users and their browsing history without their consent.

61.    Claimant has been damaged by Respondent' invasion of his privacy and is entitled to just compensation, including disgorgement of profits related to the unlawful tracking, and injunctive relief.

## SECOND CAUSE OF ACTION

### Violation of the California Invasion of Privacy Act

### California Penal Code § 631

62.    Claimant realleges and incorporates by reference all paragraphs alleged herein.

63.    California Penal Code § 631(a) provides, in pertinent part:

"Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so

obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars . . . ."

64.    To establish liability under § 631(a), a Claimant need only establish that a Respondent, "by means of any machine, instrument, contrivance, or in any other manner," did any of the following:

Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,

Or

Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

Or

Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

Or

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

Cal. Penal Code § 631(a).

65.    Respondent is a "person" within the meaning of California Penal Code § 631.

66.    Under § 631(a), Respondent must show it had the consent of all parties to a communication.

67.    Respondent did not have the consent of all parties to learn the contents of or record Claimant's private communications. Respondent also did not have consent to allow third parties to learn the contents of or record Claimant's private communications.

68.    Respondent utilizes software code on the Website that allows third parties to intercept Claimant's private communications and web activity on the Website.

69.     The Website causes the user's browser to store cookies from third parties, and to transmit those cookies alongside other data—such as button clicks, and specific URL visits—to the third party. By configuring the Website in this manner, Respondent intentionally accessed, intercepted, read, learned, and/or collected the electronic communications of Claimant, and aided and abetted the third-party cookie companies, including The Trade Desk, Google/DoubleClick, Quantum Metric, Snapchat, Twitter, TikTok, inclusive of the entities responsible for these cookies, and many others, to access, intercept, read, learn, and/or collect the electronic communications of Claimant as well.

70.     Section 631(a) is not limited to phone lines, but also applies to "new technologies," such as computers, the Internet, and email. *See Matera v. Google* Inc., 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc.*, 2006 WL 3798134, at *5–6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' Internet browsing history).

71.     The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA (and even if they do not, Respondent' deliberate and purposeful scheme that facilitated the interceptions falls under the broad statutory catch-all category of "any other manner"): (i) the Website, including the software code modules therein that are designed to cause the transmission of consumers' communications and web activity to third-parties; (ii) the third-party cookies on the Website; (iii) Respondent' computer servers, including the software code modules installed on and/or served by those servers used to place cookies and/or intercept, aid and abet others to intercept, receive, transmit, read, track, and analyze Claimant's communications; and (iv) the plan Respondent carried out to place cookies and/or intercept, aid and abet others to intercept, collect, transmit, read, and track Claimant's communications, even though Claimant explicitly declined such actions (collectively, the "Subway Instruments").

72.    The private communications that were intercepted, collected, transmitted, received, tracked, and analyzed by the "machine[s], instrument[s], or contrivance[s]" alleged above included the following:

- internet IP address of the consumer's device;
- the URLs being browsed by the consumer, as well as the referrer URL;
- the title of webpage viewed;
- webpage keywords;
- the exact date and time of the website visits;
- device identifiers; and
- data entered by Claimant into forms on the Website.

(Collectively, the information listed in the bullet points above shall be referred to as "Private Communications.")

73.    By enabling the Subway Instruments to intercept, collect, transmit, receive, track, and analyze Claimant's Private Communications without his consent, and by aiding and abetting third parties to intercept, collect, transmit, receive, track, and analyze the Private Communications, Respondent violated Section 631(a) of the CIPA. In particular, Respondent:

- intentionally tapped, electrically or otherwise, the lines and/or instruments of internet communication being used by Claimant to access the Website;
- intentionally made unauthorized connections, electrically or otherwise, with the lines and/or instruments of internet communication being used by Claimant to access the Website and allowed third parties to do so;
- willfully, and without the consent of Claimant, read and learned the contents and/or meaning of Claimant's messages and communications containing Private Communications, while the same was in transit or passing over lines of internet communication, or was being sent from and received at locations in California and allowed third parties to do so;
- used Claimant's Private Communications to increase Respondent' profits;
- allowed third parties to intercept, collect, transmit, receive, track, and analyze Claimant's Private Communications; and

- aided, agreed with, and conspired with other persons (including, without limitation, The Trade Desk, Google/DoubleClick, Quantum Metric, Snapchat, Twitter, TikTok, inclusive of the entities responsible for these cookies, and other third-party cookie companies) to unlawfully do, permit, and cause to be done the above-listed activities.

74.    Claimant has suffered loss by reason of these violations, including, but not limited to, (i) violation of his right to privacy; and (ii) loss of value in his Private Communications.

75.    Unless enjoined, Respondent will continue to commit the illegal acts alleged here. Claimant continues to be at risk because Claimant frequently uses the internet to search for information about food. Claimant continues to desire to use the internet for that purpose. Claimant has no practical way to know if his request to decline cookies will be honored and/or whether his actions on the Website will be monitored or recorded by Respondent and/or third-party cookie companies. Further, Respondent and third parties have already intercepted Claimant's Private Communications, and are currently sharing, and will continue sharing, that information with additional third parties, unless and until enjoined.

76.    Claimant seeks all relief available under the California Invasion of Privacy Act, including injunctive relief and statutory damages.

## THIRD CAUSE OF ACTION

### Violation of the California Invasion of Privacy Act

### California Penal Code § 635

77.    Claimant realleges and incorporates by reference all paragraphs alleged herein.

78.    The California Invasion of Privacy Act, codified at Cal. Penal Code §§ 630 to 638, includes the following statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

79.    California Penal Code § 635 provides as follows:

Every person who manufactures, assembles, sells, offers for sale, advertises for sale, possesses, transports, imports, or furnishes to another any device which is primarily or exclusively designed or intended for eavesdropping upon the communication of another, or any device which is primarily or exclusively designed or intended for the unauthorized interception or reception of communications between cellular radio telephones or between a cellular radio telephone and a landline telephone in violation of Section 632.5, or communications between cordless telephones or between a cordless telephone and a landline telephone in violation of Section 632.6 , shall be punished by a fine not exceeding two thousand five hundred dollars.

80.    Respondent intentionally manufactured, assembled, sold, offered for sale, advertised for sale, possessed, transported, imported, and/or furnished one or more wiretap devices (i.e., the Subway Instruments, including the software code modules therein) primarily or exclusively designed or intended for eavesdropping upon the communication of another (i.e., Claimant).

81.    In particular, the Subway Instruments contain software code modules that are primarily or exclusively designed to enable third parties to intercept, collect, transmit, receive, and track communications that users reasonably (but erroneously) believed would be sent directly and exclusively to Respondent. Further, although Claimant intended to reject all performance, functional, and analytics cookies, the software code modules of the Subway Instruments were designed to—and in fact did—cause the placement of cookies and software code which were used to intercept, collect, transmit, receive, track, analyze, and sell users' Private Communications to third parties.

82.    Claimant did not consent to any of Respondent' actions in implementing the wiretaps.

83.    Claimant has suffered loss by reason of these violations, including, but not limited to, (i) violation of his right to privacy; and (ii) loss of value in his Private Communications.

84.    Unless enjoined, Respondent will continue to commit the illegal acts alleged here. Claimant continues to be at risk because he frequently uses the internet to view food-related content. Claimant continues to desire to use the internet for that purpose. Claimant has no practical way to know if his request to decline cookies will be honored and/or whether his actions on the Website will be monitored or recorded by Respondent and/or third parties.

85.    Claimant seeks all relief available under the California Invasion of Privacy Act, including injunctive relief and statutory damages.

## FOURTH CAUSE OF ACTION

**Violation of the California Comprehensive Computer Data Access and Fraud Act**

**California Penal Code § 502**

86.    Claimant realleges and incorporates by reference all paragraphs alleged herein.

87.    Cal. Penal Code § 502 provides: "For purposes of bringing a civil or a criminal action under this section, a person who causes, by any means, the access of a computer, computer system, or computer network in one jurisdiction from another jurisdiction is deemed to have personally accessed the computer, computer system, or computer network in each jurisdiction." Devices with web browsers are "computers" within the meaning of the statute.

88.    Respondent violated Cal. Penal Code § 502(c) by, among other things, (i) knowingly causing Claimant's and other users' computers to be accessed through third-party cookies and third-party software code that causes the transmission of users' data to be transmitted to third party cookie companies; (ii) knowingly accessing and without permission using, Claimant's and other users' data and computers to devise or execute any scheme or artifice to defraud and/or deceive, and wrongfully obtain data; and (iii) knowingly accessing and without permission making use of data from Claimant and other users' computers as well as allowing third parties to do so.

89.    Despite Respondent's false representations to the contrary, Respondent was unjustly enriched by acquiring Claimant's sensitive and valuable personal information without permission and using it for Respondent' own financial benefit. Claimant retains a stake in the profits Respondent earned from Claimant's personal browsing history and other data because, under the circumstances, it is unjust for Respondent to retain those profits.

90.    Respondent allowed third parties and itself to access, copy, take, analyze, and use data from Claimant's devices while he was in the State of California. Accordingly, Respondent are deemed to have accessed Claimant's devices in California.

91.    As a direct and proximate result of Respondent's unlawful conduct within the meaning of Cal. Penal Code § 502, Respondent has caused loss to Claimant and has been unjustly enriched.

92.    Claimant seeks compensatory damages and/or disgorgement, and declarative, injunctive, or other equitable relief.

93.    Claimant is entitled to punitive or exemplary damages pursuant to Cal. Penal Code § 502(e)(4) because Respondent' violations were willful and, upon information and belief, Respondent are guilty of oppression, fraud, or malice as defined in Cal. Civil Code § 3294.

94.    Claimant is also entitled to recover reasonable attorneys' fees pursuant to Cal. Penal Code § 502(e).

### FIFTH CAUSE OF ACTION

**Violation of the California False Advertising Law,**

**Cal. Bus. & Prof. Code §§ 17500, *et seq.* ("FAL")**

95.    Claimant realleges and incorporates by reference all paragraphs alleged herein.

96.    Beginning at an exact date unknown to Claimant, but within four (4) years preceding the filing of the Complaint, Respondent, with the intent to directly or indirectly perform services, or to induce members of the public to enter into obligations relating thereto, made or disseminated or caused to be made or disseminated before the public and Claimant statements concerning such services, or matters of fact connected with the performance thereof, which were untrue or misleading, and which Respondent knew, or in the exercise of reasonable care should have known, were untrue or misleading, in violation of the FAL. In particular, Respondent made untrue, false, deceptive, and/or misleading statements in connection with its cookies banner, inclusive of the Privacy Preference Center.

97.    Respondent's cookie banner asserts facts about its services that are untrue and likely to deceive and mislead the public and reasonable consumers. In particular, Respondent made representations and statements (by omission and commission) that users of its Website could reject/opt-out of performance, functional, and analytics cookies. These representations led reasonable consumers to believe that they could reject such cookies and, in doing so, Respondent

would not cause the placement of such cookies on consumers' devices and browsers for those purposes, nor could third parties collect, receive, intercept, and compile data about users' browsing activity and Private Communications from the Website. Respondent had a duty to disclose that, despite consumers' election to reject such cookies, the Website would nonetheless cause consumers' devices to store cookies and send data to third parties, who could then use that data to track the consumers' activity and target them with advertising.

98.     Claimant, and those similarly situated, relied to their detriment on Respondent's false, misleading, and deceptive advertising and marketing practices, including each of the misrepresentations and omissions set forth above. Relying on Respondent' misrepresentations about its services—specifically its false and misleading representation that users could reject/opt-out of performance, functional, and analytics cookies—Claimant used the Website.

99.     Respondent's actions caused damage to and loss of Claimant's property right to control the dissemination and use of Claimant's personal information and communications.

100.     Respondent's representation that consumers could reject/opt-out of performance, functional, and analytics cookies if they selected to opt out of such cookies was untrue. Again, had Claimant known these facts, he would not have used the Website. Moreover, Claimant reviewed the cookie banner prior to using the Website. Had Respondent disclosed that it caused such third-party cookies to be stored on consumers' devices even when they choose to reject such cookies, Claimant would have noticed it and would not have used the Website.

101.     Respondent' acts and omissions are likely to deceive the general public.

102.     Respondent engaged in these false, misleading, and deceptive advertising and marketing practices to increase its profits. Respondent generated revenue by using the wrongfully collected information to, among other things, engage in targeted advertising.

103.     Accordingly, Respondent have engaged in false advertising, as defined and prohibited by Section 17500, *et seq.* of the California Business and Professions Code.

104.     The aforementioned practices, which Respondent used, and continue to use, to its significant financial gain also constitute unlawful competition and provide an unlawful advantage over Respondent's competitors as well as injury to the general public.

105.    Claimant has suffered an injury-in-fact, including the loss of money and/or property as a result of Respondent's unfair, deceptive, and/or unlawful practices, including the unauthorized disclosure and taking of his personal information which has value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Claimant has also suffered harm in the form of diminution of the value of his Private Communications and data.

106.    Respondent's actions caused damage to and loss of Claimant's property right to control the dissemination and use of his personal information and communications.

107.    Claimant seeks, on behalf of himself and those similarly situated, a declaration that the above-described practices constitute false, misleading, and deceptive advertising.

108.    Claimant seeks full restitution of monies, as necessary and according to proof, to restore any and all monies acquired by Respondent from Claimant, and those similarly situated by means of the false, misleading, and deceptive advertising and marketing practices complained of herein, plus interest thereon.

109.    Claimant seeks, on behalf of himself and those similarly situated, an injunction to prohibit Respondent from continuing to engage in the false, misleading, and deceptive advertising and marketing practices complained of herein. Such misconduct by Respondent, unless and until enjoined and restrained, will continue to cause injury in fact to the general public and the loss of money and property in that Respondent will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Respondent to which they are not entitled. Claimant, those similarly situated, and/or other consumers have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

## SIXTH CAUSE OF ACTION

### Violation of the California Unfair Competition Law,

### Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("UCL")

110.    Claimant realleges and incorporates by reference all paragraphs alleged herein.

111.   The UCL prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. By engaging in the aforementioned practices, Respondent have violated the UCL.

112.   Respondent is a "person" under Cal. Bus. & Prof. Code § 17201.

113.   Respondent created and implemented a scheme to obtain and share the Private Communications and private web activity from web users through a pervasive pattern of false and misleading misrepresentations and omissions. Respondent misrepresented to Claimant and other web users that they could reject/opt-out of performance, functional, and analytics cookies when, in fact, Respondent caused such cookies to be placed on consumers' devices and browsers, even after users rejected those cookies. Respondent concealed and failed to disclose to Claimant and other web users that it would cause cookies and software code to be stored on consumers' devices and browsers which would cause the interception and transmission of data about users' activity on the Website and disclosure of consumers' Private Communications to third parties and Respondent, despite consumers' clear refusal of such cookies. Further, Respondent failed to disclose to Claimant and web users that these third-party cookies enable third parties to track consumers' behavior across the Website and use that data to compile profiles of consumers for targeted advertising and marketing purposes. In particular, the third-party cookies that Respondent wrongfully places on consumers' devices and browsers enable third parties and Respondent to track and collect consumers' Private Communications and browsing history on the Website. With this information, third parties can—and almost invariably do—develop and enrich profiles on consumers, like Claimant, to, among other things, target advertising to them.

114.   These representations and omissions were misleading and deceptive.

115.   Respondent' conduct was unfair and unconscionable, particularly because Respondent allowed third parties to intrude on communications that users reasonably believed to be private, and also because Respondent made Claimant's Private Communications available to third parties, despite representing that Website users could reject/opt-out of performance, functional, and analytics cookies.

116. Respondent's conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to, and in fact did, deceive reasonable consumers. Reasonable consumers, including Claimant, would have found it material to their decisions to use the Website that Respondent would intercept, collect, transmit, receive, track, and analyze consumers' Private Communications against their wishes and without their consent, and make those Private Communications available to third parties via cookies despite their clear refusal of such cookies. Knowledge of these facts would have been a substantial factor in the consumers' decisions to use the Website.

117. Respondent' acts and practices constitute a continuing and ongoing unfair business activity defined by the UCL. Respondent' conduct is contrary to the public welfare as it transgresses civil and criminal statutes of the State of California designed to protect individuals' constitutional and statutory rights to privacy, violates established public policy, and has been pursued to attain an unjustified monetary advantage for Respondent by creating personal disadvantage and hardship to users of the Website. As such, Respondent' business practices and acts have been immoral, unethical, oppressive, and unscrupulous and have caused injury to customers far greater than any alleged countervailing benefit. The harm to consumers, which includes the interception of their communications by third parties, the wrongful collection and tracking of consumers' Private Communications, and the construction of profiles about consumers that third parties and Respondent use for its monetary gain, far outweigh the value of Respondent' conduct (i.e., the wrongful placement of third-party cookies on consumers' devices and browsers even when consumers reject such cookies).

118. Further, Respondent's "unfair" acts and practices include its violation of property, economic, and privacy interests protected by the statutes identified above. To establish liability under the unfair prong, Claimant need not establish that these statutes were actually violated, although the claims pleaded herein do so.

119. Respondent owed Claimant a duty to disclose these facts because they were exclusively known and/or accessible to Respondent, who had superior knowledge of its activities with respect to the Private Communications of Claimant and users; because Respondent actively

concealed the facts; and because Respondent intended for consumers to rely on the omissions in question. Moreover, Respondent' omissions were contrary to representations that Respondent actually made to consumers that they could reject/opt-out of performance, functional, and analytics cookies.

120.    Claimant, and those similarly situated, relied on Respondent' misrepresentations and omissions. Reasonable consumers would have relied on Respondent' promise to consumers that they could reject/opt-out of performance, functional, and analytics cookies, and, in light of that promise, would have relied on the omissions, particularly because Respondent made representations to the contrary and consumers were not informed that Respondent would cause third-party cookies to be stored on consumers' devices and browsers, despite consumers' clear rejection of such third-party cookies.

121.    Respondent' conduct was also unlawful in that it violated the following statutes: the California Invasion of Privacy Act, Cal. Penal Code §§ 502, 630–638; the FAL; and the CLRA. Respondent' conduct also breached the promises Respondent made in its cookie banner, inclusive of its Privacy Preference Center.

122.    Moreover, Respondent's conduct was unlawful and violated California's Consumer Privacy Act, Cal. Civ. Code § 1798.100, *et seq.*, which sets strict standards regarding the collection, use, retention, sharing, and sale of "personal information," including but not limited to, §§ 1798.100(a), (b), (c), (e), 1798.110, 1798.115, 1798.120, 1798.130.

123.    For instance, Respondent violated Cal. Civ. Code § 1798.100(a) and § 1798.115 by (a) informing consumers that they could reject/opt-out of performance, functional, and analytics cookies, but, nonetheless, caused such cookies to be placed on users' devices and browsers and causing the transmission of consumers' Private Communications to third parties after users rejected such cookies; (b) failing to inform consumers that third parties would collect their Private Communications; and (c) failing to inform consumers that third-party cookie companies would use data collected to compile profiles on consumers. Respondent further violated Cal. Civ. Code § 1798.100(e) because Respondent collect consumers' personal information and do not implement reasonable security procedures and practices appropriate to

the nature of the personal information to protect the personal information from unauthorized or illegal access, destruction, use, modification, or disclosure in accordance with Cal. Civ. Code § 1798.81.5. Such security procedures Respondent could have implemented could have been to simply honor consumers' requests to reject/opt-out of performance, functional, and analytics cookies.

124.    Respondent also violated Cal. Civ. Code § 1798.120 because it received direction from Claimant and other users not to sell their personal information when they chose to reject performance, functional, and analytics cookies, but Respondent nonetheless caused third-party cookies to be placed on Claimant and other users' devices and browsers, thereby selling their Private Communications to third-parties.

125.    Claimant has suffered an injury-in-fact, including the loss of money and/or property as a result of Respondent' unfair, deceptive, and/or unlawful practices, including the unauthorized disclosure and taking of his personal information which has value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Claimant has also suffered harm in the form of diminution of the value of his private and personally identifiable data and content.

126.    Respondent's actions caused damage to and loss of Claimant's property right to control the dissemination and use of his personal information and communications.

127.    Respondent's representation that consumers could reject/opt-out of performance, functional, and analytics cookies if they selected to opt out of such cookies was untrue. Again, had Claimant known these facts, he would not have used the Website. Moreover, Claimant reviewed the cookie banner prior to using the Website. Had Respondent disclosed that they cause third-party cookies to be stored on consumers' devices even after they choose to reject/opt-out of performance, functional, and analytics cookies, Claimant would have noticed it and would not have used the Website.

128.    The wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Respondent's business. Respondent's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, in the State of California.

129. Claimant, on behalf of himself and the general public, seeks restitution, injunctive relief, and reasonable attorneys' fees, as well as any other relief deemed proper.

<u>**SEVENTH CAUSE OF ACTION**</u>

**Violation of the Consumers Legal Remedies Act**

**California Civil Code §§ 1750, *et seq.* ("CLRA")**

130. Claimant realleges and incorporates by reference all paragraphs alleged herein.

131. Respondent's actions, representations, and conduct described herein have violated, and continue to violate the CLRA, because they extend to transactions that are intended to result, or which have resulted, in the sale or lease of goods or services to consumers.

132. Claimant, and other Website users, are "consumers" as that term is defined by the CLRA in California Civil Code § 1761(d).

133. The Website and Respondent's online platform services are "services" under the CLRA.

134. Respondent's representations, set forth in this Complaint, led Website users to falsely believe that they could reject/opt-out of performance, functional, and analytics cookies, and in doing so Respondent would not cause such cookies and third-party software code to be placed on consumers' devices to cause the transmission of consumers' web activity and Private Communications to third parties, nor allow Respondent and third parties to track consumers' behavior on the Website. By engaging in the actions, representations, and conduct set forth in this Complaint, Respondent has violated, and continues to violate, § 1770(a)(5), § 1770(a)(7), and § 1770(a)(9) of the CLRA.

135. In violation of California Civil Code § 1770(a)(5), Respondent's acts and practices constitute improper representations that its Website services have sponsorship, approval, characteristics, uses, or benefits, which they do not have. In violation of California Civil Code § 1770(a)(7), Respondent's acts and practices constitute improper representations that the Website services are of a particular standard, quality, or grade, when they are of another. In violation of California Civil Code § 1770(a)(9), Respondent has advertised services with intent not to sell them as advertised.

136.    Claimant requests that Respondent be enjoined from continuing to employ the unlawful methods, acts, and practices alleged herein pursuant to California Civil Code § 1780(a)(2). If Respondent are not restrained from engaging in these types of practices in the future, Claimant and users will continue to suffer harm. Claimant, and those similarly situated, have no adequate remedy at law to stop Respondent's continuing practices.

137.    On or about July 19, 2023, Respondent was provided with notice and a demand to correct, or otherwise rectify the unlawful, unfair, false, and/or deceptive practices complained of herein. Despite receiving the notice and demand, Respondent failed to do so. Among other things, Respondent failed to identify consumers, notify them of their right to remedies under the CLRA, and/or to provide those remedies. Accordingly, Claimant seeks, pursuant to California Civil Code § 1780(a)(3), compensatory damages, punitive damages, and restitution of any ill-gotten gains due to Respondent' acts and practices.

138.    Claimant also requests that he be awarded costs and reasonable attorneys' fees pursuant to California Civil Code § 1780(d).

## EIGHTH CAUSE OF ACTION

### Intrusion Upon Seclusion

139.    Claimant realleges and incorporates by reference all paragraphs alleged herein.

140.    To assert a claim for intrusion upon seclusion, a Claimant must plead (i) that the Respondent intentionally intruded into a place, conversation, or matter as to which Claimant had a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

141.    By causing third-party cookies to be stored on consumers' devices, which enabled third parties to intercept, collect, transmit, receive, track, and analyze consumers' internet activity and Private Information in violation of Respondent' representations that consumers could reject/opt-out of performance, functional, and analytics cookies, Respondent intentionally intruded upon the solitude and/or seclusion of users in that Respondent effectively placed third parties, including The Trade Desk (adsrvr.org), Google/DoubleClick, Quantum Metric,

Snapchat, Twitter, and TikTok, and many others, in the middle of communications to which they were not invited, welcomed, or authorized.

142. The tracking and access caused by the cookies that Respondent caused to be stored on consumers' devices was not authorized by Claimant, and, in fact, Claimant specifically chose to reject such cookies.

143. Claimant had an objectively reasonable expectation of privacy surrounding his communications and web browsing activity on the Website based on Respondent's promise that users could reject/opt-out of performance, functional, and analytics cookies, and state criminal and civil laws designed to protect individual privacy. Moreover, Respondent's own cookie banner represented that "[b]ecause we respect your right to privacy, you can choose not to allow some types of cookies," specifically "Performance Cookies," "Functional Cookies," and "Analytics Cookies."

144. Respondent' intentional intrusion into Claimant's internet communications and web browsing history would be highly offensive to a reasonable person given that Respondent represented that consumers could reject/opt-out of performance, functional, and analytics cookies when, in fact, it caused third-party cookies to be stored on consumers' devices and browsers even after consumers rejected all such cookies. Indeed, Claimant reasonably expected, based on Respondent's false representations, that Respondent would not cause such third-party cookies to be stored on Claimant's devices or cause the transmission of Claimant's internet activities to third parties.

145. Respondent's conduct was intentional and intruded on Claimant's communications which constitute private searches, web browsing activity, and other data.

146. Claimant has been damaged as a direct and proximate result of Respondent's invasion of his privacy and is entitled to just compensation. Respondent's invasion of privacy caused Claimant to suffer damages, including but not limited to:

      a.    Nominal damages;

      b.    General damages for invasion of his privacy rights in an amount to be determined by a jury without reference to specific pecuniary harm;

c.    Sensitive and confidential information that Claimant intended to remain private is no longer private; and

d.    Respondent and the third-party cookie companies took something of value from Claimant and derived benefits therefrom without Claimant's knowledge or informed consent and without sharing the benefit of such value.

147.    Claimant seeks appropriate relief for that injury, including but not limited to, damages that will reasonably compensate him for the harm to his privacy interests as well as disgorgement of profits made by Respondent as a result of its intrusions upon Claimant's privacy.

## NINTH CAUSE OF ACTION

### Breach of Contract

148.    Claimant realleges and incorporates by reference all paragraphs alleged herein.

149.    Respondent' relationship with its users is governed by the Website's cookie banner, inclusive of the Privacy Preference Center, among other documents.

150.    These governing documents contain enforceable promises that Respondent made to Claimant, including but not limited to the following: that users "can choose not to allow some types of cookies," specifically "Performance Cookies," "Functional Cookies," and "Analytics Cookies."

151.    Respondent breached these duties and violated these promises by causing third-party cookies and software code to be stored on consumers' devices and browsers that cause the transmission of Claimant's and private web activity and Private Communications to third parties and Respondent even though Respondent represented that Claimant could reject/opt-out of performance, functional, and analytics cookies, and Claimant, in fact, chose to opt out of such cookies by adjusting the appropriate toggles to indicate rejection of performance, functional, and analytics cookies.

152.    Respondent further violated these provisions because Respondent did not honor users' requests to opt out of the selling and sharing of online data through the use of cookies and

similar technologies, as described above, and because Respondent shared users' information with third parties even when users did not consent to such sharing.

153.    At all relevant times and in all relevant ways, Claimant performed his obligation under the contract(s) in question or was excused from performance of such obligations through the unknown and unforeseen conduct of others.

154.    As a direct and proximate result of Respondent's breach of contract, Claimant did not receive the full benefit of the bargain, and instead received services from Respondent that were less valuable than described in the contract. Claimant, therefore, was damaged in an amount at least equal to the difference in value between that which was promised and Respondent's partial, deficient, and/or defective performance.

155.    Respondent's breach caused Claimant the following damages:

    a.    Nominal damages;

    b.    The diminution in value of Claimant's personal information;

    c.    The loss of privacy due to Respondent making sensitive and confidential information that Claimant intended to remain private no longer private;

    d.    Respondent took something of value from Claimant and derived benefits therefrom without Claimant's knowledge or informed consent and without sharing the benefit of such value; and

    e.    Claimant suffered an invasion of privacy. Claimant seeks compensatory damages for the invasion of his privacy.

156.    As a direct consequence of the breaches of contract and violations of promises described above, Claimant seeks nominal damages, general damages, compensatory damages, consequential damages, unjust enrichment, and any other just relief.

## TENTH CAUSE OF ACTION

### Breach of Implied Covenant of Good Faith and Fair Dealing

157.    Claimant realleges and incorporates by reference all paragraphs alleged herein.

158.    Respondent's relationship with its users is governed by the Website's cookie banner, inclusive of the Privacy Preference Center, among other documents.

159.    These governing documents contain enforceable promises that Respondent made to Claimant, including but not limited to the following: that users "can choose not to allow some types of cookies," specifically "Performance Cookies," "Functional Cookies," and "Analytics Cookies."

160.    Respondent breached these duties and violated these promises by causing third-party cookies and software code to be stored on Claimant's devices and browsers that cause the transmission of Claimant's private web activity and Private Communications to third parties and Respondent, even though Respondent promised that Claimant could reject/opt-out of performance, functional, and analytics cookies, and Claimant, in fact, chose to opt out of such cookies.

161.    California law recognizes the implied covenant of good faith and fair dealing in every contract.

162.    In dealing between Respondent and its users, Respondent is invested with discretionary power affecting the rights of its users.

163.    Respondent purport to respect and protect its users' privacy.

164.    Despite its contractual promises to allow consumers to reject/opt-out of performance, functional, and analytics cookies, Respondent took actions outside that contractual promise to deprive Claimant of benefits of his contract with Respondent.

165.    Respondent's own tracking and its allowance of third parties to track and intercept internet communications was objectively unreasonable given its privacy promises.

166.    Respondent's unauthorized disclosure of users' personal information to Respondent was objectively unreasonable given Respondent's privacy promises.

167.    Respondent's conduct in tracking and causing third parties to intercept and track the internet communications of users who rejected performance, functional, and analytics cookies evaded the spirit of the bargain made between Respondent and Claimant since it caused Claimant to surrender more data than Claimant otherwise bargained for.

168.    As a result of Respondent's misconduct and breach of its duty of good faith and fair dealing, Claimant suffered damages. Claimant did not receive the benefit of the bargain for

which he contracted and for which he paid valuable consideration in the form of his personal information, which, as alleged above, has ascertainable value.

169.    As a direct consequence of the breach of the implied covenant of good faith and fair dealing described above, Claimant seeks nominal damages, general damages, compensatory damages, consequential damages, and any other just relief.

## ELEVENTH CAUSE OF ACTION

### Common Law Fraud, Deceit, and/or Misrepresentation

170.    Claimant realleges and incorporates by reference all paragraphs alleged herein.

171.    Respondent fraudulently and deceptively informed Claimant that he could reject/opt-out of performance, functional, and analytics cookies when in fact Respondent caused such cookies and software code to be stored on consumers' devices—including Claimant's— that cause the transmission of private web activity and Private Communications to third parties and Respondent when consumers visit and/or use the Website, even after consumers reject/opt-out of such cookies.

172.    These misrepresentations and omissions were known exclusively to, and actively concealed by, Respondent, not reasonably known to Claimant, and material at the time they were made. Respondent knew, or should have known, how the Website and cookies on the Website functioned, through testing the Website or otherwise, and knew, or should have known, that the Website placed third party cookies on users' devices—including Claimant's—even after users opted out of such cookies. Respondent' misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Claimant as to whether to use the Website. In misleading Claimant and not so informing him, Respondent breached its duty to him. Respondent also gained financially from, and as a result of, its breach.

173.    Claimant relied to his detriment on Respondent's misrepresentations and fraudulent omissions.

174.    Claimant has suffered an injury-in-fact, including the loss of money and/or property as a result of Respondent's unfair, deceptive, and/or unlawful practices, including the unauthorized disclosure and taking of his personal information which has value as demonstrated

by the use and sale of consumers' browsing activity, as alleged above. Claimant has also suffered harm in the form of diminution of the value of his private and personally identifiable data and content.

175.    Respondent's actions caused damage to, and loss of, Claimant's property right to control the dissemination and use of his personal information and communications.

176.    Respondent's representation that consumers could reject/opt-out of certain cookies, including performance, analytics and functional cookies, if they selected to opt out of such cookies was untrue. Again, had Claimant known these facts, he would not have used the Website. Moreover, Claimant reviewed the cookie banner prior to using the Website. Had Respondent disclosed that it caused such cookies to be stored on consumers' devices even when they choose to reject performance, functional, and analytics cookies, Claimant would have noticed it and would not have used the Website.

177.    By and through such fraud, deceit, misrepresentations, and/or omissions, Respondent intended to induce Claimant, and those similarly situated, to alter their positions to their detriment. Specifically, Respondent fraudulently and deceptively induced Claimant and those similarly situated, to, without limitation, use the Website under the mistaken belief that Respondent would not collect data itself or share users' personal data with third parties through performance, functional, and analytics cookies when consumers chose to reject/opt-out of such cookies.

178.    Claimant justifiably and reasonably relied on Respondent' misrepresentations and omissions, and, accordingly, was damaged by Respondent.

179.    As a direct and proximate result of Respondent' misrepresentations and/or omissions, Claimant has suffered damages, as alleged above.

180.    Respondent' conduct, as described herein, was wilful and malicious and was designed to maximize Respondent's profits even though Respondent knew that it would cause loss and harm to Claimant and other web users.

**TWELFTH CAUSE OF ACTION**

**Negligent Misrepresentation**

181.    Claimant realleges and incorporates by reference all paragraphs alleged herein.

182.    Respondent represented to Claimant a fact that was not true, namely, that users could reject/opt-out of performance, functional, and analytics cookies. In truth, Respondent caused such cookies and software code to be stored on consumers' devices and browsers which caused the transmission of users' private web activity and Private Communications to third parties and Respondent, even after users rejected such cookies.

183.    These representations were material at the time they were made. They concerned material facts that were essential to the decisions of Claimant and other users regarding whether and/or how to visit and use the Website.

184.    Respondent made identical misrepresentations to other Website users regarding users' ability to reject/opt-out of performance, functional, and analytics cookies.

185.    Respondent should have known its representations were false, and that they had no reasonable grounds for believing them to be true when they made them.

186.    Respondent intended that Claimant and users of the Website rely on Respondent's representations.

187.    By and through such negligent misrepresentations, Respondent intended to induce Claimant, and those similarly situated, to alter their positions to their detriment. Specifically, Respondent negligently induced Claimant, and Website users, to without limitation, browse the Website under the mistaken belief that Respondent would not collect data itself or cause the sharing of Claimant's personal data, and the personal data of those similarly situated, with third parties after he/they chose to reject/opt-out of performance, functional, and analytics cookies.

188.    Claimant, and those similarly situated, reasonably relied on Respondent's representations.

189.    Claimant, and those similarly situated, were harmed as set forth above.

COMPLAINT AND DEMAND FOR ARBITRATION

190.    The reliance of Claimant, and those similarly situated, on Respondent's representations was a substantial factor in causing the harm.

### THIRTHEENTH CAUSE OF ACTION

**Trespass to Chattels**

191.    Claimant realleges and incorporates by reference all paragraphs alleged herein.

192.    At all times relevant, Claimant owned, leased, and/or controlled his devices.

193.    Respondent, intentionally and without consent or other legal justification, caused cookies to be stored on Claimant's browsers and devices, which enabled third parties and Respondent to track Claimant's activity on the Website and use the data collected for its own advantage, as described above.

194.    Respondent was unjustly enriched as a result of its wrongful conduct, including through its misrepresentation that users could reject/opt-out of performance, functional, and analytics cookies. Further, Respondent failed to disclose that they cause third-party cookies and software code to be stored on consumers' devices and browsers, which cause the transmission of users' private web activity and Private Communications to third parties and Respondent, even after consumers reject such cookies.

195.    Respondent's intentional and unjustified placing of cookies designed to track Claimant's internet activities and actual tracking of Claimant's activities interfered with Claimant's use of the following personal property owned by Claimant: (a) his computers and other electronic devices; and (b) his personally identifiable information.

196.    Respondent's trespass of Claimant's computing devices resulted in harm to Claimant and caused Claimant the following damages:

a.    Nominal damages for trespass;

b.    Reduction of storage, disk space, and performance of Claimant's computing devices; and

c.    Loss of value of Claimant's computing devices.

## FOURTEENTH CAUSE OF ACTION

### Unjust Enrichment

197.    Claimant realleges and incorporates by reference all paragraphs alleged herein.

198.    Respondent created and implemented a scheme to increase its own profits through a pervasive pattern of false statements and fraudulent omissions.

199.    Respondent was unjustly enriched as a result of its wrongful conduct, including through its misrepresentations that users could reject/opt-out of performance, functional, and analytics cookies. Further, Respondent failed to disclose that they cause third-party cookies and software code to be stored on consumers' devices and browsers, which cause the transmission of users' private web activity and Private Communications to third parties and Respondent, even after consumers reject such cookies.

200.    Respondent received a measurable benefit at the expense of Claimant in the form of the additional data Claimant surrendered at Claimant's expense.

201.    Respondent appreciated, recognized, and chose to accept the monetary benefits that Claimant conferred onto Respondent to his detriment. These benefits were the expected result of Respondent acting in its pecuniary interest at the expense of Claimant.

202.    It would be unjust for Respondent to retain the value of Claimant's property and any profits earned thereon.

203.    There is no justification for Respondent's enrichment. It would be inequitable, unconscionable, and unjust for Respondent to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct. Claimant is entitled to restitution of the benefits Respondent unjustly retained and/or any amounts necessary to return Claimant to the position he occupied prior to having his Private Communications obtained by Respondent.

204.    Claimant pleads this claim separately as well as in the alternative to his other claims, as without such claims he would have no adequate legal remedy.

### PRAYER FOR RELIEF

WHEREFORE, reserving all rights, Claimant respectfully requests judgment against Respondent as follows:

A.    An award of compensatory damages, including statutory damages where available, to Claimant against Respondent for all damages sustained as a result of Respondent' wrongdoing, including both pre- and post-judgment interest thereon;

B.    An order for full restitution;

C.    An order requiring Respondent to disgorge revenues and profits wrongfully obtained;

D.    An order temporarily and permanently enjoining Respondent from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

E.    For reasonable attorneys' fees and the costs of suit incurred; and

F.    For such further relief as may be just and proper.

Dated: December 18, 2023

**GUTRIDE SAFIER LLP**

*/s/Seth A. Safier/s/*

Seth A. Safier (State Bar No. 197427)
 seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
 marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
 todd@gutridesafier.com
Kali R. Backer (State Bar No. 342492)
 kali@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

*Attorneys for Claimant*

# EXHIBIT C



Western Case Management Center
45 E River Park Place West
Suite 308
Fresno, CA 93720
Telephone: (877)528-0880
Fax: (855)433-3046

December 26, 2024

Seth A. Safier, Esq.
Gutride Safier LLP
100 Pine Street
Suite 1250
San Francisco, CA 94111
Via Email to: Seth@gutridesafier.com

Rebekah S. Guyon, Esq.
Greenberg Traurig, LLP
1840 Century Park East
Suite 1900
Los Angeles, CA 90067-2121
Via Email to: Rebekah.guyon@gtlaw.com

Case Number: 01-23-0005-8490

Ryan Ussery
-vs-
Franchise World Headquarters, LLC

Dear Parties:

This letter acknowledges this matter was closed pursuant to Arbitrator Kruze's November 26, 2024 Order. Therefore, on December 5, 2024, the American Arbitration Association (AAA) administratively closed this matter.

Please note that the AAA WebFile® ECF Guidelines will not apply after the closing of the case. Therefore, any additional submissions from the parties in this matter should be submitted via email to the AAA, with copies sent to all other parties.

The business will receive a refund of $1750 for unused arbitrator compensation deposits, which will be mailed from our New York office in approximately one week.

We thank Arbitrator Kruze, who is receiving a copy of this correspondence, for serving on this matter.

Pursuant to the AAA's current policy, in the normal course of our administration, the AAA may maintain certain electronic case documents in our electronic records system. Such electronic documents may not constitute a complete case file. Other than certain types of electronic case documents that the AAA maintains indefinitely, electronic case documents will be destroyed 18 months after the stated closing date.

Thank you for choosing the AAA to administer your arbitration.

Sincerely,
/s/
Christina Negrete
Manager of ADR Services
Direct Dial: (559)475-6265
Email: ChristinaNegrete@adr.org
Fax: (855)433-3046

Supervisor Information: *Donna Martinez, Director of ADR Operations, (559) 490-1881,*

*DonnaMartinez@adr.org*


cc:
Kali R. Backer, Esq.
Marie A. McCrary, Esq.
Seth A. Safier, Esq.
Blake M. Bailus, Esq.
Juliana Villalobos
Todd Kennedy, Esq.
Colette Kanbarian
Andreas Moffett