**GUTRIDE SAFIER LLP**
Seth A. Safier (State Bar No. 197427)
seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
todd@gutridesafier.com
Kali R. Backer (State Bar No. 342492)
kali@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| RYAN USSERY, an individual, on behalf of himself, the general public, and those similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>FRANCHISE WORLD HEADQUARTERS, LLC,<br><br>Defendant. | CASE NO. 3:25-cv-01337-LJC<br><br>FIRST AMENDED PETITION TO CONFIRM ARBITRATION AWARD; AND CLASS ACTION COMPLAINT FOR INVASION OF PRIVACY; INTRUSION UPON SECLUSION; WIRETAPPING IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 631); USE OF A PEN REGISTER IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 638.51); COMMON LAW FRAUD, DECEIT AND/OR MISREPRESENTATION; UNJUST ENRICHMENT; AND TRESPASS TO CHATTELS AND SEEKING CONFIRMATION OF ARBITRABLE AWARD\<br><br>JURY TRIAL DEMANDED |

## TABLE OF CONTENTS


INTRODUCTION ........ 3

THE PARTIES ........ 5

JURISDICTION AND VENUE ........ 5

RELATED ARBITRATION PROCEEDINGS ........ 5

SUBSTANTIVE ALLEGATIONS ........ 6

A. Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookie Trackers. ........ 6

B. Defendant Falsely Informed Users That They Could Reject the Website's Use of Cookies. ........ 11

C. The Private Communications Collected As a Result of Third Party Cookies Transmitted When Visiting the Website. ........ 17

1. Google Cookies ........ 17

2. TikTok Cookies ........ 22

3. Facebook Cookies ........ 26

4. Additional Third Party Cookies ........ 29

D. The Private Communications Collected are Valuable. ........ 30

PLAINTIFF'S EXPERIENCES ........ 32

TOLLING ........ 34

CLASS ALLEGATIONS ........ 36

CAUSES OF ACTION ........ 38

First Cause of Action: Invasion of Privacy ........ 38

Second Cause of Action: Intrusion Upon Seclusion ........ 41

Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631) ........ 43

Fourth Cause of Action: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51) ........ 47

Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation ........ 49

Sixth Cause of Action: Unjust Enrichment ........ 52

Seventh Cause of Action: Trespass to Chattels ........ 53

Plaintiff Ryan Ussery ("Plaintiff") brings this action on behalf of himself, the general public, and all others similarly situated against Franchise World Headquarters, LLC ("Defendant" or "Subway"). Plaintiff's allegations against Defendant are based upon information and belief and upon investigation of Plaintiff's counsel, except for allegations specifically pertaining to Plaintiff, which are based upon Plaintiff's personal knowledge.

## INTRODUCTION

1. This Class Action Complaint concerns an egregious privacy violation and total breach of consumer trust in violation of California law. When consumers visit Defendant's website (www.subway.com, the "Website"), Defendant displays to them a popup cookie consent banner. Defendant's cookie banner discloses that the Website uses cookies but expressly gives users the option to control how they are tracked and how their personal data is used. Defendant assures visitors that they can manage their "Cookie Settings" as shown in the following screenshot:




2. Like most internet websites, Defendant designed the Website to include resources and programming scripts from third parties that enable those parties to place cookies and other similar tracking technologies on visitors' browsers and devices and/or transmit cookies along with user data. However, unlike other websites, Defendant's Website offers consumers a choice to browse without being tracked, followed, and targeted by third party data brokers and advertisers. However, Defendant's promises are outright lies, designed to lull users into a false sense of security. Even after users elect to manage their cookie settings to decline or reject all cookies not strictly necessary for the Website to function, including all Performance, Functional, and Analytics cookies, Defendant surreptitiously enables several third parties – including Alphabet, Inc. (DoubleClick and Google Analytics), ByteDance Ltd. (TikTok), Meta Platforms, Inc. (Facebook), The Trade Desk, Inc. (adsrvr.org), X Corp (Twitter), Snap Inc. (SnapChat), and

Quantum Metric, Inc. (the "Third Parties") – to place and/or transmit cookies that track users' website browsing activities and eavesdrop on users' private communications on the Website.

3. Contrary to their express declination or rejection of cookies and tracking technologies on the Website, Defendant nonetheless caused cookies, including the Third Parties' cookies, to be sent to Plaintiff and other visitors' browsers, stored on their devices, and transmitted to the Third Parties along with user data. These third-party cookies permitted the Third Parties to track and collect data in real time regarding Website visitors' behaviors and communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

4. The Third Parties analyze and aggregate this user data across websites and time for their own purposes and financial gain, including, creating consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; creating audience segments based on shared traits (such as Millennials, tech enthusiasts, etc.); and performing targeted advertising and marketing analytics. Further, the Third Parties share user data and/or user profiles to unknown parties to further their financial gain.

5. This type of tracking and data sharing is exactly what the Website visitors who clicked or selected the "Cookie Settings" button on the Website's cookie consent banner, then adjusted rejected all cookies not strictly necessary for the Website to function, including all Performance, Functional, and Analytics cookies, in the Privacy Preference Center sought to avoid. Defendant falsely told Website users that it respected their privacy and that they could avoid tracking and data sharing when they browsed the Website. Despite receiving notice of consumers' express declination of consent, Defendant defied it and violated state statutes, and tort duties, harming Plaintiff and those similarly situated Website users.

## THE PARTIES

6. Plaintiff Ryan Ussery is, and was at all relevant times, an individual and resident of Bakersfield, California. Plaintiff intends to remain in California and makes his permanent home there.

7. Defendant Franchise World Headquarters, LLC is a Connecticut limited liability company with its headquarters and principal place of business in Milford, Connecticut.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and Plaintiff and Defendant are citizens of different states.

9. The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendant within, affecting, and emanating from, the State of California. Defendant regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and services provided to persons in the State of California. Defendant has engaged, and continues to engage, in substantial and continuous business practices in the State of California.

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District.

11. Plaintiff accordingly alleges that jurisdiction and venue are proper in this Court.

## RELATED ARBITRATION PROCEEDINGS

12. On December 18, 2023, Plaintiff filed a demand for arbitration in San Francisco with the American Arbitration Association ("AAA") against Defendant. Exhibit B. Plaintiff asserted claims in the arbitration arising from the same conduct alleged herein.

13. Arbitrator Diana Kruze was assigned as the arbitrator.

14. Following an initial conference, the Arbitrator ordered briefing regarding the AAA's jurisdiction over the dispute and arbitrability of Plaintiff's claims. *See* Exhibit A.

15. After receiving briefing and supporting evidence from the parties, the Arbitrator issued a final order/award, dated November 26, 2024, concluding: (a) Plaintiff did not waive his right to challenge arbitrability; (b) Plaintiff did not manifest consent to the agreement to arbitrate; (c) Plaintiff is not estopped from challenging arbitrability of the dispute; and (d) Plaintiff is not bound by the arbitration agreement. Exhibit A.

16. The AAA subsequently issued a closing letter, dated December 26, 2024, confirming that it had closed the arbitration as dismissed. Exhibit C.

## SUBSTANTIVE ALLEGATIONS

### A. Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookie Trackers.

17. Every website, including the Website, is hosted by a server that sends and receives communications in the form of HTTP requests, such as "GET" or "POST" requests, to and from Internet users' browsers. For example, when a user clicks on a hyperlink on the Website, the user's browser sends a "GET" request to the Website's server. The GET request tells the Website server what information is being requested (e.g., the URL of the webpage being requested) and instructs the Website's server to send the information back to the user (e.g., the content of the webpage being requested). When the Website server receives an HTTP request, it processes that request and sends back an HTTP response. The HTTP request includes the client's IP address so that the Website server to knows where to send the HTTP response.

18. An IP address (Internet Protocol address) is a unique numerical label assigned to each device connected to a network that uses the Internet Protocol for communication, typically expressed as four sets of numbers separated by periods (e.g., 192.168.123.132 for IPv4 addresses). IP addresses can identify the network a device is on and the specific device within that network. Public IP addresses used for internet-facing devices reveal geographical locations, such as country, city, or region, through IP geolocation databases.

19. Defendant voluntarily integrated "third-party resources" from the Third Parties into its Website programming. "Third-party resources" refer to tools, content or services provided by third-parties, such as analytics tools, advertising networks, or payment processors,

that a website developer utilizes by embedding scripts, styles, media, or application programming interface (API) into the website's code. Defendant's use of the third-party resources on the Website is done so pursuant to agreements between Defendant and those Third Parties.

20. The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website server to a user's web browser and stored locally on the user's device. As described below, cookies generally contain a unique identifier which enables the website to recognize and differentiate individual users. Cookie files are sent back to the website server along with HTTP requests, enabling the website to identify the device making the requests, and to record a session showing how the user interacts with the website.

21. First-party cookies are those that are placed on the user's device directly by the web server with which the user is knowingly communicating (in this case, the Website's server). First-party cookies are used to track users when they repeatedly visit the same website.

22. A third-party cookie is set by a third-party domain/webserver (e.g., www.google.com; analytics.tiktok.com; www.facebook.com, etc.). When the user's browser loads a webpage (such as a webpage of the Website) containing embedded third-party resources, the third parties' programming scripts typically issue HTTP commands to determine whether the third-party cookies are already stored on the user's device and to cause the user's browser to store those cookies on the device if they do not yet exist. Third-party cookies include an identifier that allows the third-party to recognize and differentiate individual users across websites (including the Website) and across multiple browsing sessions.

23. As described further below, the third-party cookies stored on and/or loaded from users' devices when they interact with the Website are transmitted to those third parties, enabling them to surreptitiously track in real time and collect Website users' personal information, such as their browsing activities and private communications with Defendant, including the following:

- **Browsing History**: Information about the webpages a Website user visits, including the URLs, titles, and keywords associated with the webpages viewed, time spent on each page, and navigation patterns;
- **Visit History**: Information about the frequency and total number of visits to the Website;
- **Website Interactions:** Data on which links, buttons, or ads on the Website that a user clicks;
- **User Input Data**: The information the user entered into the Website's form fields, including search queries, the user's name, age, gender, email address, location, and/or payment information;
- **Demographic Information**: Inferences about age, gender, and location based on browsing habits and interactions with Website content;
- **Interests and Preferences**: Insights into user interests based on the types of Website content viewed, products searched for, or topics engaged with;
- **Shopping Behavior**: Information about the Website products viewed or added to shopping carts;
- **Device Information**: Details about the Website user's device, such as the type of device (mobile, tablet, desktop), operating system, and browser type;
- **Referring URL**: Information about the website that referred the user to the Website;
- **Session Information**: Details about the user's current Website browsing session, including the exact date and time of the user's session, the session duration and actions taken on the Website during that session;
- **User Identifiers**: A unique ID that is used to recognize and track a specific Website user across different websites over time; and/or
- **Geolocation Data**: General location information based on the Website user's IP address or GPS data, if accessible.

(Collectively, the browsing activities and private communications listed in the bullet points above shall be referred to herein as "Private Communications").

24. Third-party cookies can be used for a variety of purposes, including (i) analytics (e.g., tracking and analyzing visitor behavior, user engagement, and effectiveness of marketing campaigns); (ii) personalization (e.g., remembering a user's browsing history and purchase preferences to enable product recommendations); (iii) advertising/targeting (e.g., delivering targeted advertisements based on the user's consumer profile (i.e., an aggregated profile of the user's behavior, preferences, and demographics); and (iv) social media integration (e.g., enabling sharing of users' activities with social media platforms). Ultimately, third-party cookies are utilized to boost website performance and revenue through the collection, utilization, and dissemination of user data.

25. Defendant operates a chain of fast food restaurants specializing in sandwiches. Defendant also owns and operates the Website, which allows visitors to view Subway menu items and place online orders for Subway's products. As they interact with the Website (e.g., by entering data into forms, clicking on links, and making selections), Website users communicate Private Communications to Defendant, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

26. Defendant chose to install or integrate its Website with resources from the Third Parties that, among other things, use cookies. Thus, when consumers visit the Website, both first-party cookies and third-party cookies are placed on their devices and/or transmitted. This is caused by software code that Defendant incorporate into the Website, or that Defendant causes to be loaded. Because Defendant controls the software code of the Website, it has complete control over whether first-party and third-party cookies are placed on users' devices and/or transmitted to third parties.

27. Defendant explained the third-party cookies it used on the Website as follows in its Privacy Statement:

> When you visit or interact with Subway® Services as well as any third-party advertisers and/or service providers, we may use a variety of technologies that automatically or passively collect information about your online activity. We and our service providers use technologies such as cookies, web beacons, unique advertising identifiers, and mobile device identifiers to collect information about the use of our websites and mobile services.
>
> …
>
> We use cookies and similar technologies for a wide range of purposes in our websites, applications and email communications to deliver the Subway® Services and improve your experience. For example, we use information collected from cookies and similar technologies to help us recognize you, customize and improve your experience, provide security, analyze usage of the Subway® Services, gather demographic information about our user base, to offer the Subway® Services to you, to monitor the success of marketing programs, and to serve targeted advertising on our site and on other sites around the Internet. To learn more about the categories of cookies we (and our service providers) use and what they are used for please click on Cookie Settings.
>
> …
>
> We also use analytics and tracking tools, such as Google Analytics, Adobe Marketing Cloud, Facebook Customer Audience and others, to help us track, segment and analyze usage of the Subway® Services, and to help us or those vendors serve more targeted advertising to you on the Subway® Services and across the Internet. Those tools may use technology such as cookies, web beacons, pixel tags, log files, or other technologies to collect and store certain information, such as Usage Data, Device & Technical Data, and Geolocation Data.[1]

28. Defendant further explained the third-party cookies it used on the Website as follows in its Privacy Preference Center:

> **Strictly Necessary Cookies**
>
> These cookies are necessary for the website to function and cannot be switched off in our systems. They are usually only set in response to actions made by you which

[1] The Subway Group Privacy Statement (updated 7/3/2023) (current version available at https://www.subway.com/en-us/privacy/privacy-policy) (the "Privacy Statement"). Defendants have subsequently updated their Privacy Statement but, based on information and belief, this version was in effect at the time of Plaintiff's declination or rejection of cookies on the Website.

amount to a request for services, such as setting your privacy preferences, logging in or filling in forms.

**Performance Cookies**

These cookies allow us to count visits and traffic sources so we can measure and improve the performance of our site. They help us know which pages are the most and least popular and see how visitors move around the site.

**Functional Cookies**

These cookies enable the website to provide enhanced functionality and personalisation. They may be set by us or by third party providers whose services we have added to our pages.

**Analytics Cookies**

These cookies may be set through out our site by our advertising partners. They may be used by those companies to build a profile of your interests and show you relevant ads on other sites.

**B. <u>Defendant Falsely Informed Users That They Could Reject the Website's Use of Cookies.</u>**

29. When consumers in California visited the Website, the Website immediately displayed to them a popup cookie consent banner. As shown in the screenshot below, the cookie consent banner stated, "By clicking 'Accept All Cookies', you agree to the storing of cookies on your device to enhance site navigation, analyze site usage, and assist in our marketing efforts." The banner then purported to provide users the option to, rather than choosing to "Accept All Cookies," instead manage the Website's "Cookie Settings," as shown in the following screenshot from the Website:




30. Users who elected to manage their cookie settings by selecting or clicking the button to do so were then presented with Defendant's "Privacy Preference Center" window. There, Defendant represented that users could "choose not to allow some types of cookies," including all "Performance Cookies," "Functional Cookies," and "Analytics Cookies." The only cookies users could not decline or reject were the "Strictly Necessary Cookies" that are "necessary for the website to function[,]" as shown in the following screenshots:




31. Website users who adjusted all available settings to decline or reject all Performance, Functional, and Analytics cookies, then confirmed their declination or rejection of all such cookies and tracking technologies by selecting or clicking the "Confirm My Choices" button, could then continue to browse the Website, as the popup cookie consent banner and Privacy Preference Center window disappeared.

32. Defendant's popup cookie consent banner and Privacy Preference Center window led Plaintiff, and all those Website users similarly situated, to believe that they declined or rejected all cookies and tracking technologies, except those strictly necessary for the Website to function, and especially those used to "analyze site usage[] and assist in [Defendant's] marketing efforts." The banner further reasonably led Plaintiff and those Website users similarly situated to believe that Defendant would not allow third parties, through cookies, to access their Private Communications with the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, upon adjusting settings to decline or reject all cookies except those strictly necessary for the Website to function, including all Performance, Functional, and Analytics cookies.

33. Defendant's representations, however, were false. In truth, Defendant did not abide by its users' wishes. When users adjusted settings on the Privacy Preference Center window to decline or reject all cookies except those strictly necessary for the Website to function, including all Performance, Functional, and Analytics cookies, they provided notice to Defendant that they did not consent to the placement or transmission of third-party cookies that would allow those parties to obtain their Private Communications with the Website. Nevertheless, Defendant caused the Third-Party tracking cookies to be placed on Website users' browsers and devices and/or transmitted to the Third Parties along with user data.

34. In particular, when users adjusted settings on the Privacy Preference Center window to decline or reject all cookies except those strictly necessary for the Website to function, including all Performance, Functional, and Analytics cookies, Defendant nonetheless continued to cause the Third Parties' cookies to be placed on users' devices and/or transmitted to the Third Parties along with user data, enabling them to collect user data in real time that discloses Website visitors' Private Communications, including browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. In other words, even when consumers like Plaintiff tried to protect their privacy by declining or rejecting all such cookies, Defendant failed to prevent cookies from being transmitted to Third Parties, enabling them to track user behavior and communications.

35. Some aspects of the operations of the Third-Party cookies on the Website can be observed using specialized tools that log incoming and outgoing Website network transmissions. The following screenshots, obtained using one such tool, show examples of Third-Party cookies being transmitted from a Website user's device and browser to Third Parties even after the user adjusted settings on the Privacy Preference Center window to decline or reject all Performance, Functional, and Analytics cookies.


https://www.subway.com/en-us/menunutrition/menu
Elements Console Sources Network Performance
Preserve log Disable cache No throttling
Filter Invert Hide data URLs
All Fetch/XHR JS CSS Img Media Font Doc WS Wasm Manifest Other
Blocked Requests 3rd-party requests
Use large request rows Group by frame
Show overview Capture screenshots
Name St... Domain Cookies
up?adv=lc56sd5&ref=https%... 200 insight.adsrvr.org 2
up?adv=lc56sd5&ref=https%... 200 insight.adsrvr.org 2
src=6953753;dc_pre=CLrCis... 200 adservice.google.com 2
?random=1689583381289&c... 200 www.google.com 2
src=6953753;dc_pre=CL32jc... 200 adservice.google.com 2
?random=1689583380306&c... 200 www.google.com 2
?T=B&u=https%3A%2F%2F... 200 subway-app.quantummetric.com 2
?T=B&u=https%3A%2F%2F... 200 subway-app.quantummetric.com 2
?T=B&u=https%3A%2F%2F... 200 subway-app.quantummetric.com 2
?T=B&u=https%3A%2F%2F... 200 subway-app.quantummetric.com 2
?random=1689583424934&c... 200 www.google.com 2
?random=1689583424881&c... 200 www.google.com 2
src=6953753;dc_pre=COz59... 200 adservice.google.com 2
?T=B&u=https%3A%2F%2F... 200 subway-app.quantummetric.com 2
?T=B&u=https%3A%2F%2F... 200 subway-app.quantummetric.com 2
?T=B&u=https%3A%2F%2F... 200 subway-app.quantummetric.com 2
?T=B&u=https%3A%2F%2F... 200 subway-app.quantummetric.com 2
?T=B&u=https%3A%2F%2F... 200 subway-app.quantummetric.com 2
?T=B&u=https%3A%2F%2F... 200 subway-app.quantummetric.com 2
?T=B&u=https%3A%2F%2F... 200 subway-app.quantummetric.com 2
?T=B&u=https%3A%2F%2F... 200 subway-app.quantummetric.com 2
?T=B&u=https%3A%2F%2F... 200 subway-app.quantummetric.com 2
?T=B&u=https%3A%2F%2F... 200 subway-app.quantummetric.com 2
?T=B&u=https%3A%2F%2F... 200 subway-app.quantummetric.com 2
?T=B&u=https%3A%2F%2F... 200 subway-app.quantummetric.com 2
?T=B&u=https%3A%2F%2F... 200 subway-app.quantummetric.com 2
?T=B&u=https%3A%2F%2F... 200 subway-app.quantummetric.com 2
?T=B&u=https%3A%2F%2F... 200 subway-app.quantummetric.com 2
?T=B&u=https%3A%2F%2F... 200 subway-app.quantummetric.com 2
?s=9e9589aaaea8110fd7733... 200 subway-app.quantummetric.com 2
?T=B&u=https%3A%2F%2F... 200 subway-app.quantummetric.com 2
jsapi 301 www.google.com 2
?random=1689583387509&c... 200 www.google.com 2
?random=1689583387491&c... 200 www.google.com 2
up?adv=lc56sd5&ref=https%... 200 insight.adsrvr.org 2
SUBWAY
Menu
Buy 1 FL, Get a FL half off
Buy 1 footlong and get 1 half off when you order online or in our app! Use code BOGO50. Limited time only.
Terms & Conditions
VIEW PARTICIPATING LOCATIONS
NEW DELI HEROES
SERIES
SUBWAY® SERIES
A menu of irresistible subs.




36. The screenshots above show the "Network" tab of Chrome Developer Tools, which contains a list of HTTP network traffic transmissions between the user's browser and various third-party websites while the user visited and interacted with Defendant's Website at https://www.subway.com. The screenshots depict only network traffic occurring ***after*** the user declined or rejected all cookies except those strictly necessary for the Website to function, including all Performance, Functional, and Analytics cookies using the settings available on

the Privacy Preference Center window. As shown above, despite the user's declination or rejection of all such cookies, the user's interactions with the Website resulted in the user's browser making a large number of GET and POST HTTP requests to third party web domains like www.google.com; analytics.tiktok.com; www.facebook.com; and others. As further shown in the right-hand column of the screenshots, the user's browser sent cookies along with those HTTP requests to the third parties. These screenshots demonstrate that the Website caused third-party cookie data and users' Private Communications to be transmitted to Third Parties, even after consumers declined or rejected all cookies except those strictly necessary for the Website to function, including all Performance, Functional, and Analytics cookies, using the settings available on the Privacy Preference Center window. All of these network calls are made to the Third Parties without the user's knowledge, and despite the user's declination or rejection of all such cookies.

37. Website users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, are surreptitiously obtained by the Third Parties via these cookies.

38. As users interact with the Website, even after adjusting settings to decline or reject all cookies except those strictly necessary for the Website to function, including all Performance, Functional, and Analytics cookies, using the settings available on the Privacy Preference Center window, thereby declining or rejecting the use of cookies and similar technologies used to "analyze site usage[] and assist in [Defendant's] marketing efforts" as well as the sale or sharing of the user's personal information with third parties for such functions, or other purposes, more data regarding users' behavior and communications are sent to third parties, alongside the cookie data. The third-party cookies that Defendant wrongfully allow to be stored on users' devices and browsers, and to be transmitted to the Third Parties, enable the Third Parties to track and collect data on users' behaviors and communications, including Private

Communications, on the Website. Because third-party cookies enable Third Parties to track users' behavior across the Internet and across time, user data can be correlated and combined with other data sets to compile comprehensive user profiles that reflect consumers' behavior, preferences, and demographics (including psychological trends, predispositions, attitudes, intelligence, abilities, and aptitudes). These Third Parties monetize user profiles for advertising, sales, and marketing purposes to generate revenue and target advertising to Internet users. Advertisers can gain deep understanding of users' behavioral traits and characteristics and target those users with advertisements tailored to their consumer profiles and audience segments.

39. The Third-Party code that the Website causes to be loaded and executed by the user's browser becomes a wiretap when it is executed because it enables the Third Parties—separate and distinct entities from the parties to the conversations—to use cookies to eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties. When the Third Parties use their respective wiretaps on Website users' Private Communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other. The Third Parties each have the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes as described in more detail below.

### C. <u>The Private Communications Collected As a Result of Third Party Cookies Transmitted When Visiting the Website.</u>

#### 1. Google Cookies

40. Defendant causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users reject all unnecessary cookies (including Performance, Functional, and Analytics cookies) to and from the **<u>www.google.com</u>**, **<u>adservice.google.com</u>**, and **<u>ad.doubleclick.net</u>** domains. Each of these domains is associated with Alphabet Inc.'s digital advertising and analytics platform that collects user information via cookies to assist

Google in performing data collection, behavioral analysis, user retargeting, and analytics.[2] Google serves targeted ads to web users across Google's ad network, which spans millions of websites and apps. Nearly 20% of web traffic is tracked by Google's DoubleClick cookies.[3] Google's cookies help it track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance. Further, by identifying users who have shown interest in certain products or content, Google's cookies enable its advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Google's ad network.[4]

41. Specifically, Google sends cookies when a web user visits a webpage that shows Google Marketing Platform advertising products and/or Google Ad Manager ads.[5] "Pages with Google Marketing Platform advertising products or Google Ad Manager ads include ad tags that instruct browsers to request ad content from [Google's] servers. When the server delivers the ad content, it also sends a cookie. But a page doesn't have to show Google Marketing Platform advertising products or Google Ad Manager ads for this to happen; it just needs to include Google Marketing Platform advertising products or Google Ad Manager ad tags, which might load a click tracker or impression pixel instead." *Id.* As Google explains, "Google Marketing

---

[2] *See* Our advertising and measurement cookies (available at https://business.safety.google/adscookies/).

[3] *See, e.g.* https://www.ghostery.com/whotracksme/trackers/doubleclick.

[4] *See, e.g.* About cross-channel remarketing in Search Ads 360 (available at https://support.google.com/searchads/answer/7189623?hl=en); About dynamic remarketing for retail (available at https://support.google.com/google-ads/answer/6099158?hl=en&sjid=1196213575075458908-NC).

[5] *See* How Google Marketing Platform advertising products and Google Ad Manager use cookies (available at https://support.google.com/searchads/answer/2839090?hl=en&sjid=1196213575075458908-NC); *see also* Cookies and user identification (available at https://developers.google.com/tag-platform/security/concepts/cookies).

Platform advertising products and Google Ad Manager send a cookie to the browser after any impression, click, or other activity that results in a call to our servers." *Id.*

42. Google also uses cookies in performing analytical functions. As Google explains, "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights into [] business[es]."[6] "To measure a website … [one] add[s] a small piece of JavaScript measurement code to each page on [a] site." *Id.* Then, "[e]very time a user visits a webpage, the tracking code will collect … information about how that user interacted with the page." *Id.* Google Analytics enables website owners to "measure when someone loads a page, clicks a link, [ ] makes a purchase;" "completes a purchase"; "searches [] website or app"; "select content on [] website or app"; "views an item"; and "views their shopping cart."[7]

43. Google's cookies allow it to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data.[8]

---

[6] How Google Analytics Works (available at https://support.google.com/analytics/answer/12159447?hl=en).

[7] Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://developers.google.com/analytics/devguides/collection/ga4/events).

[8] *See* About the Google Tag (available at https://support.google.com/searchads/answer/7550511?hl=en); How Floodlight Recognizes Users (available at https://support.google.com/searchads/answer/2903014?hl=en); How Google Ads tracks website conversions (available at https://support.google.com/google-ads/answer/7521212); Google Ads Help, Cookie: Definition (available at https://support.google.com/google-ads/answer/2407785?hl=en); About demographic targeting in Google Ads (available at https://support.google.com/searchads/answer/7298581?hl=en&sjid=1196213575075458908-NC&visit_id=638670675669576522-2267083756&ref_topic=7302618&rd=1); How Google Analytics Works (https://support.google.com/analytics/answer/12159447); Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and

44. For example, the Google software code that Defendant causes to be stored on and executed by the Website user's device causes the following data to be sent to Google's domain, at https://googleads.g.doubleclick.net:

**Request** Header Query Body Cookies Raw Summary

| Key | Value |
|---|---|
| random | 1689583424934 |
| cv | 11 |
| fst | 1689583424934 |
| bg | ffffff |
| guid | ON |
| async | 1 |
| gtm | 45be37c0 |
| u_w | 2240 |
| u_h | 1260 |
| url | https://www.subway.com/en-us/menunutrition/menu |
| ref | https://www.subway.com/en-us/locator |
| hn | www.googleadservices.com |
| frm | 0 |
| tiba | Our Menu \| Subway® |
| auid | 476043990.1689583303 |
| uaa | arm |
| uab | 64 |
| uafvl | Not.A%2FBrand;8.0.0.0\|Chromium;114.0.5735.198\|Google%20Chrome;114.0.5735.198 |
| uamb | 0 |
| uap | macOS |
| uapv | 13.2.1 |
| uaw | 0 |
| data | event=gtag.config |
| rfmt | 3 |
| fmt | 4 |

45. These parameters include data detailing aspects of the consumer and his or her activities on the Website. The "auid" parameter contains a user id that enables Google to track the user across different pages and sessions. The "url" parameter discloses to Google the full

Recommended events (available at https://support.google.com/analytics/answer/9267735).

URL of the page the user is visiting, while the "tiba" parameter discloses the full title of the page, and the "ref" parameter reveals the previous page that the user had visited. The "uaa," "uap," and "uapv" parameters reveal details regarding the user's system, including system architecture, operating system, and version. The "u_w" and "u_h" parameters reveal the user's screen width and height, in pixels.

46. Along with this data, the Google software code that Defendant causes to be stored on and executed by the user's device causes the "IDE" cookie to be sent to Google:




47. According to Google, the "IDE" cookie is an "advertising" cookie, used "to show Google ads on non-Google sites," and "to personalize the ads you see."[9]

48. Finally, the data sent to Google contains the user's IP address.

49. Because Google's cookies operate across multiple sites (i.e., cross-site tracking), the cookie enables Google to track users as they navigate from one site to another, and to comprehensively observe and evaluate user behavior online. Google's advertising platform aggregates user data to create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics and audience segments based on shared traits (such as females, Millennials, etc.), and to perform targeted advertising and marketing analytics.

50. Thus, the Google cookies used on the Website enable Google to track users' interactions with advertisements to help advertisers understand how users engage with ads across different websites. Further, the user data collected through the cookie enables the delivery of personalized ads based on user interests and behaviors. For instance, if a user frequently visits

[9] https://policies.google.com/technologies/cookies?hl=en-US. *See also* https://business.safety.google/adscookies/.

travel-related websites, Google will show him or her more travel-related advertisements. Further, the collected data is used to generate reports for advertisers, helping them assess the performance of their ad campaigns and make data-driven decisions (such as renaming their products). Further, Google's advertising platform enables advertisers to retarget marketing, which Google explains allows advertisers to "show previous visitors ads based on products or services they viewed on your website. With messages tailored to your audience, dynamic remarketing helps you build leads and sales by bringing previous visitors back to your website to complete what they started."[10]

51. Further, in its "Shared Data Under Measurement Controller-Controller Data Protection Terms," Google states: "Google can access and analyze the Analytics data customers share with us to better understand online behavior and trends, and improve our products and services—for example, to improve Google search results, detect and remove invalid advertising traffic in Google Ads, and test algorithms and build models that power services like Google Analytics Intelligence that apply machine-learning to surface suggestions and insights for customers based on their analytics data and like Google Ads that applies broad models to improve ads personalization and relevance. These capabilities are critical to the value of the products we deliver to customers today."[11] Thus, Google can have the capability to use the data it collects for understanding online behavior and trends, machine learning, and improving its own products and services.

**2. TikTok Cookies**

52. Defendant also causes third-party cookies to be transmitted to and from Website users' browsers and devices, even after users elect to decline or reject all non-necessary cookies, to and from the **analytics.tiktok.com** domain. This domain is associated with TikTok for Business, a suite of tools offered by TikTok, a social media platform owned by ByteDance Ltd.,

[10] Dynamic remarketing for web setup guide (available at https://support.google.com/google-ads/answer/6077124).

[11] Shared Data Under Measurement Controller-Controller Data Protection Terms (available at https://support.google.com/analytics/answer/9024351).

known for short-form video sharing. [12] The TikTok platform is used to create and share videos, and it utilizes cookies for various purposes including assisting brands and marketers to create, manage, and optimize ad campaigns on the platform.[13]

53. TikTok utilizes analytics.tiktok.com cookies to collect data on user interactions with websites that have integrated TikTok's tracking technologies (such as the Website). These cookies are used to "measure and improve the performance of your advertising campaigns and to personalize the user's experience (including ads) on TikTok."[14] TikTok further explains that it uses cookies to "match events with people who engage with your content on TikTok. Matched events are used to improve measurement and optimize ad campaigns. They can also contribute to building your retargeting and engagement audiences." *Id.* These cookies enable TikTok to recognize and track users across different sessions and domains (i.e., cross-site tracking) and to collect and synchronize user data to observe and evaluate TikTok user behavior.

54. These cookies enable TikTok to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, including *email addresses and phone numbers*; (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) session information, (x) user identifiers, and (xi) geolocation data in the form of the IP address.[15]

---

[12] *See* Our advertising and measurement cookies (available at https://business.safety.google/adscookies/).

[13] *See, e.g.*, TikTok for Business (https://ads.tiktok.com/business/en-US/products/ads; and https://ads.tiktok.com/business/en-US/products/measurement); TikTok Business Help Center; Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

[14] TikTok Business Help Center; Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

[15] *Id.*; *see also* TikTok for Business: Enhance Data Postback with the TikTok Pixel (https://ads.tiktok.com/help/article/enhance-data-postback-with-the-tiktok-pixel?lang=en); TikTok for Business: Advanced Matching for Web (available at https://ads.tiktok.com/help/article/advanced-matching-web?redirected=1); TikTok for Business: About TikTok Pixel (available at https://ads.tiktok.com/help/article/tiktok-pixel?lang=en).

55. For example, the TikTok software code that Defendant causes to be stored on and executed by the Website user's device causes the following data to be sent to TikTok's domain, at https://analytics.tiktok.com/api/v2/pixel:

Request Header Query Body Cookies Raw Summary + PLAIN


```
{
  "event": "Pageview",
  "message_id":
  "messageId-1689583424986-2676875604050-C3DJ0487M4VETA97VORG",
  "event_id": "",
  "is_onsite": false,
  "timestamp": "2023-07-17T08:43:44.986Z",
  "context": {
    "ad": {
      "sdk_env": "external",
      "jsb_status": 2
    },
    "user": {
      "anonymous_id": "_EjnUs3xupBOoSH_drsOWDecAnT"
    },
    "pixel": {
      "code": "C3DJ0487M4VETA97VORG",
      "runtime": "1"
    },
    "page": {
      "url": "https://www.subway.com/en-us/menunutrition/menu",
      "referrer": "https://www.subway.com/en-us/locator"
    },
    "library": {
      "name": "pixel.js",
      "version": "2.1.33"
    },
    "device": {
      "platform": "pc"
    },
    "session_id":
    "c196d20a-247d-11ee-9965-08c0eb5ded9c::bFg0gjo5jZkbmaLI1HNx-C3DJ
    487M4VETA97VORG",
    "pageview_id":
    "pageId-1689583424984-7826100343874-C3DJ0487M4VETA97VORG",
    "variation_id": "test_3",
    "userAgent": "Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7)
    AppleWebKit/537.36 (KHTML, like Gecko) Chrome/114.0.0.0 Safari/
    537.36"
  },
  "_inspection": {},
  "properties": {}
}
```


56. The data includes the "session_id," which is a unique identifier generated by TikTok to track a user's activity. This allows TikTok to correlate the user's behavior from a

browsing session, including page views and conversions, to a particular user to enhance advertising measurement, attribution, and targeting.[16]

57. The data further indicates, among other things, that the user has viewed the page on the Defendant's website at the url https://www.subway.com/en-us/menunutrition/menu.

58. Along with this data, the TikTok software code that Defendant causes to be stored on and executed by the user's device causes the "_ttp" cookie to be sent to TikTok's domain:

**Request** Header Query Body Cookies Raw | Summary +

| Key | Value |
|---|---|
| _ttp | 2Sgw7kdSCz7NPKb2IIZWrUIoOr4 |

59. According to TikTok's documentation, the "_ttp" cookie is one of the company's advertising cookies, the purpose of which is "[t]o measure and improve the performance of your advertising campaigns and to personalize the user's experience (including ads) on TikTok."[17]

60. Further, along with all of this data, the TikTok software code that Defendant causes to be stored on and executed by the user's device causes the user's "user-agent" information to be sent to TikTok:

| | |
|---|---|
| user-agent | Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/114.0.0.0 Safari/537.36 |

61. The "user-agent" corresponds to the device and browser that the user has used to access the Website.

62. Finally, the data sent to TikTok includes the user's IP address.

63. By collecting this user data, TikTok performs user behavior tracking, i.e., monitoring user actions like page views, clicks, and interactions to understand user engagement; advertising optimization, i.e., gathering data to enhance the relevance and effectiveness of

[16] *See, e.g.*, How to get TikTok session id? (available at https://gbtimes.com/how-to-get-tiktok-session-id/).

[17] *See* TikTok for Business: Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

TikTok advertising campaigns; and performance measurement (i.e., assessing the success of marketing efforts by analyze user responses to ads and content).[18]

64. Further, TikTok's Automatic Advanced Matching feature functions as follows: "When a visitor lands on your website and inputs customer information during registration, sign-in, contact, or checkout on a website where you installed your pixel, Automatic Advanced Matching will capture information from those fields. …TikTok will use hashed information to link event information to people on TikTok. Tiktok may use matched events to better attribute events to TikTok ads, optimize advertisers' future campaigns, and depending on advertisers' and users' settings, TikTok may also add people to advertisers' retargeting or engagement audiences."[19]

### 3. Facebook Cookies

65. The **facebook.com** domain is associated with Facebook, owned and operated by Meta Platforms, Inc. This domain is associated with Meta's digital advertising and analytics platform that collects user information via cookies to assist Meta in performing data collection, behavioral analysis, user retargeting, and analytics.[20] Meta serves targeted ads to web users across Meta's ad network, which spans millions of websites and apps.

66. When consumers visit the Website, Facebook code is executed that causes the "c_user" cookie—a text file containing a unique integer corresponding to the user's Facebook account—to be sent to Facebook/Meta. This enables Facebook/Meta to track the user's interactions on the Website, to deliver targeted ads to the user on the Facebook and Instagram platforms, and to provide analytic metrics to advertisers. Along with this "c_user" cookie, extensive data is sent regarding the user's activities on the website, such as the following:

---

[18] *See* TikTok for Business: Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

[19] TikTok for Business: How to set up Automatic Advanced Matching (available at https://ads.tiktok.com/help/article/how-to-set-up-automatic-advanced-matching?lang=en).

[20] https://www.facebook.com/privacy/policies/cookies/.

| Key | Value |
|---|---|
| id | 343758842793215 |
| ev | SubscribedButtonClick |
| dl | https%3A%2F%2Fwww.subway.com%2Fen-us%2Flocator |
| rl | https%3A%2F%2Fwww.subway.com%2Fen-us%2Fmenunutrition%2Fmenu |
| if | false |
| ts | 1689583422548 |
| cd[buttonFeatures] | %7B"classList"%3A"closeLocator"%2C"destination"%3A""%2C"id"%3A""%2C"imageUrl"%3A"url(%5C"https%3A%2F%2Flocator-svc.subway.com%2Fv3%2Fimages%2Fsvg-desktop-order2.svg%5C")"%2C"innerText"%3A""%2C"numChildButtons"%3A0%2C"tag"%3A"button"%2C"type"%3A"button"%2C"name"%3A""%2C"value"%3A""%7D |
| cd[buttonText] | |
| cd[formFeatures] | %5B%5D |
| cd[pageFeatures] | %7B"title"%3A"Find%20a%20Subway%C2%AE%20Restaurant%20Near%20You%20%7C%20Subway%C2%AE"%7D |
| sw | 2240 |
| sh | 1260 |
| udff[fn] | ee4951c6c6db333f016c0bd22d510a4d5349772c4bfa4b019dd48fa09a3b573a |
| udff[ct] | 04a5bc7a752897850faf78d33747b4280560e4e52fdb3ff3c4fbdc7ec0ac46de |
| v | 2.9.111 |
| r | stable |
| a | adobe_launch |
| ec | 4 |
| o | 2078 |
| fbp | fb.1.1689583303471.169350947 |
| cs_est | true |
| it | 1689583387435 |
| coo | false |
| es | automatic |
| tm | 3 |

67. In the example above, the data informs Facebook/Meta that the user clicked on a button on the URL "https://www.subway.com/en-us/locator," that the button contained an icon image located at "https://locator-svc.subway.com/v3/images/svg-desktop-order2.svg," and that the user previously had visited the page "https://www.subway.com/en-us/menunutrition/menu". This reveals to Facebook/Meta that the user first explored the menu and then moved to the store locator, to find a nearby location to place an order. The tracking data also reveals the user's screen resolution (2240 x 1260), indicating that the user was utilizing a high-resolution desktop

or laptop display. Further, the data includes the "fbp" parameter, which further uniquely identifies the user for tracking across various sessions and websites.

68. By identifying users who have shown interest in certain products or content, the Facebook cookies enable Meta's advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Meta's ad network.[21] These cookies allow Meta to collect data on how users interact with websites, regardless of whether they have a Facebook account or are logged in.[22]

69. The Facebook cookies allow Meta to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data (including IP addresses).[23]

70. Meta utilizes the data collected through the Facebook cookies for its own purposes, including by using the data to tailor content and target advertisements to users. This includes practices such as (i) **Ad Targeting and Retargeting**, in which Meta uses the facebook.com cookie to track users' online behavior across different sites, building a profile based on their browsing habits, purchases, and interactions. This profile enables Facebook to deliver highly targeted ads within the Facebook ecosystem and on other sites that are part of Facebook's Audience Network; (ii) **Conversion Tracking**, in which Meta uses the facebook.com cookie to enable business partners to track specific actions users take after viewing or clicking on a Facebook ad, such as making a purchase or signing up for a newsletter; (iii) **Audience Insights and Analytics**, in which Meta uses the facebook.com cookie to provide data to businesses on user demographics, interests, and behaviors across their sites and apps; and (iv) **Cross-Device and Cross-Platform Tracking**, in which Meta uses the facebook.com cookie

---

[21] *Id.*; https://allaboutcookies.org/what-data-does-facebook-collect

[22] https://allaboutcookies.org/what-data-does-facebook-collect.

[23] *Id.*

to support tracking users across devices and platforms, so that ads are targeted consistently regardless of the device a user is on. This ensures that advertisers can follow users across devices.

**4. Additional Third Party Cookies**

71. Defendant also causes third-party cookies to be transmitted to and from Website users' browsers and devices, even after users elect to decline or reject all non-necessary cookies, to and from other third party domains, including (i) insight.adsrvr.org; (ii) twitter.com and t.co; (iii) tr.snapchat.com; and (iv) quantummetric.com.

72. The **insight.adsrvr.org** domain is associated with The Trade Desk, Inc., a digital advertising company that offers a cloud-based ad-buying platform that enables businesses to plan, manage, optimize, and measure data-driven digital advertising campaigns.[24] The Trade Desk uses insight.adsrvr.org cookies to collect data on users such as their geographic locations, the type of device users are using, and users' interests as inferred from their web browsing or app usage activity."[25] This data helps The Trade Desk personalize ad content and track users across the internet.[26]

73. The **twitter.com** and **t.co** domains are associated with X Corp, formerly known as Twitter. X Corp's cookies collect a wide range of user data, including a user's browsing history; IP address; interactions with advertisements; data used to authenticate and secure personal accounts; and reading a device's local storage.[27] X Corp uses the collected user data to target users with personalized advertisements and content, generate analytics on website interaction, and to conduct unspecified "Research and Development."[28]

74. The domain **tr.snapchat.com** is associated with Snap Inc. (SnapChat), a social media company that uses its cookies to measure users' conduct across distinct websites to help

---

[24] *See* The Trade Desk, Inc. 2023 Form 10-K (filed February, 15 2024).

[25] *Id.*

[26] *Id.*

[27] *See* https://help.x.com/en/rules-and-policies/x-cookies.

[28] *Id.*

advertisers target ads.[29] SnapChat uses tr.snapchat.com to collect data on browsing history, choices, and interactions with advertisements.[30] This data helps Snapchat personalize ad content and track users across the internet.[31]

75. The subdomain **quantummetric.com** is associated with Quantum Metric, Inc. Quantum Metric provides "session replay technology" for use on the Website. Quantum Metric itself touts that its session replay technology, which is embedded in the Website, "allows you to watch an end user's session as they experienced it, similar to how you watch a video."[32] The technology allows one to "pause, rewind, and fast-forward the session (just like a YouTube video) to watch how a user interacts with a website or mobile app."[33] This means that Quantum Metric collects a recording of every users interaction with the Website. All of this information is sent to Quantum Metric along with the user's IP address and user-agent information identifying the user's device and browser.

76. These cookies allow these Third Parties to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) demographic information, (v) interests and preferences, (vi) shopping behaviors, (vii) device information, (viii) referring URLs, (ix) session information, (x) user identifiers, and/or (xi) geolocation data.

### D. The Private Communications Collected are Valuable.

77. The Private Communications that the Third Parties track and collect by way of the cookies on the Website are valuable to Defendant as well as the Third Parties. Defendant can use the data to create and analyze the performance of marketing campaigns, website design, product placement, and target specific users or groups of users for advertisements. For instance, if Defendant wanted to market certain of its menu offerings or food products to consumers, Defendant could use the data collected by the Third Parties to monitor users who visit webpages

[29] *See* https://snapdiscoveries.com/what-is-tr-snapchat-com-is-used-for.

[30] *Id.*

[31] *Id.*

[32] *See* https://www.quantummetric.com/enterprise-guide-to-session-replay/

[33] *Id.*

related to specific products, then advertise similar products to those particular users when they visit other webpages. The third-party cookies also enable Defendant to target online advertisements to users when they visit ***other*** websites, even those completely unrelated to Defendant and its products.

78. Data about users' browsing history enables Defendant to spot patterns in users' behavior on the Website and their interests in, among other things, Defendant's menu offerings or food products. On a broader scale, it enables Defendant to gain an understanding of trends happening across its brands and across the fast food market. All of this helps Defendant further monetize the Website and maximize revenue by collecting and analyzing user data.

79. The value of the Private Communications tracked and collected by the Third Parties using cookies on the Website can be quantified. Legal scholars observe that "[p]ersonal information is an important currency in the new millennium."[34] Indeed, "[t]he monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend." *Id*. "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id*.

80. Numerous empirical studies quantify the appropriate value measure for personal data. Generally, the value of personal data is measured as either the consumer's willingness to accept compensation to sell his or her data or the consumer's willingness to pay to protect his or her information.

81. Through its false representations and aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties to track users' Private Communications on the Website using third-party cookies, Defendant is unjustly enriching itself at the cost of consumer privacy and choice, when the consumer could otherwise have the ability to choose if and how they would monetize their data.

[34] *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004).

**PLAINTIFF'S EXPERIENCES**

82. Plaintiff visited the Website to browse information about Subway's menu options and food products on one or more occasions during the last four years.

83. When Plaintiff visited the Website, the Website immediately presented him with Defendant's popup cookie consent banner, which provided the option to either "Accept All Cookies" or otherwise manage the Website's "Cookie Settings." Plaintiff viewed Defendant's representation on the popup cookie consent banner that, "By clicking 'Accept All Cookies,' you agree to the storing of cookies on your device to enhance site navigation, analyze site usage, and assist in our marketing efforts." He also viewed the "Cookie Settings" button in the cookie banner.

84. Consistent with his typical practice in rejecting or otherwise declining the placement or use of cookies and tracking technologies, Plaintiff selected and clicked the "Cookie Settings" button. In doing so, Plaintiff was then presented with Defendant's Privacy Preference Center window. There, Plaintiff saw Defendant's representation that he could "choose not to allow some types of cookies." Plaintiff also saw that he could decline or reject all Performance, Functional, and Analytics cookies by adjusting the settings to do so, except for "Strictly Necessary Cookies," which he could not decline or reject. Accordingly, Plaintiff adjusted all available settings in the Privacy Preference Center window to decline or reject all cookies other than those strictly necessary for the Website to function, including all Performance, Functional, and Analytics cookies, then confirmed his choices by selecting or clicking the "Confirm My Choices" button.

85. Plaintiff believed that adjusting all available settings on the Privacy Preference Center window found on the Website would allow him to opt out of, decline, and/or reject all cookies and other tracking technologies, except those strictly necessary for the Website to function (inclusive of those cookies that cause the disclosure of tracking data to third-party advertising networks and analytics services for the purposes of analyzing Plaintiff's use of the Website or assisting in Defendant's marketing efforts).

86. In adjusting all available settings to decline or reject all cookies except those strictly necessary for the Website to function, Plaintiff gave Defendant notice that he did not consent to the use or placement of cookies and tracking technologies while browsing the Website. Further, Plaintiff specifically rejected, based on Defendant's representations, those cookies used to "analyze site usage[] and assist in [Defendant's] marketing efforts" and share information with third parties. In reliance on these representations and promises, only then did Plaintiff continue browsing the Website.

87. Even before the popup cookie consent banner appeared on the screen, Defendant caused cookies and tracking technologies, including those used for analytics and advertising, to be placed on Plaintiff's device and/or transmitted to the Third Parties along with user data, without Plaintiff's knowledge. Accordingly, the Privacy Preference Center window's representation to Plaintiff that he could reject the use and/or placement of all cookies and other tracking technologies, except those strictly necessary for the Website to function, while he browsed the Website was false. Contrary to what Defendant made Plaintiff believe, he did not have a choice about whether third-party cookies would be placed on his device and/or transmitted to the Third Parties along with his user data; rather, Defendant had already caused that to happen.

88. Then, as Plaintiff continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner and Privacy Preference Center window, and despite Plaintiff's clear rejection of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing analytics and advertising services from the Third Parties on his device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff's Private Communications as Plaintiff browsed the Website.

89. Defendant's representations that consumers could decline or reject all cookies except those strictly necessary for the Website to function while Plaintiff and users browsed the Website, or at least those involved in analyzing site usage or assisting in Defendant's marketing efforts, were untrue. Had Plaintiff known this fact, he would not have used the Website.

Moreover, Plaintiff reviewed the popup cookie consent banner and Privacy Statement prior to using the Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after Website users choose to decline or reject all cookies except those strictly necessary for the Website to function, Plaintiff would have noticed it and would not have used the Website or, at a minimum, he would have interacted with the Website differently.

90. Plaintiff continues to desire to browse content featured on the Website. Plaintiff would like to browse websites that do not misrepresent that users can decline or reject all cookies and tracking technologies except those strictly necessary for the Website to function. If the Website were programmed to honor users' requests to decline or reject all cookies and tracking technologies, except those strictly necessary for the Website to function, Plaintiff would likely browse the Website again in the future, but will not do so until then. Plaintiff regularly visits websites that feature content similar to that of the Website. Because Plaintiff does not know how the Website is programmed, which can change over time, and because he does not have the technical knowledge necessary to test whether the Website honors users' requests to decline or reject all cookies and tracking technologies, except those strictly necessary for the Website to function, Plaintiff will be unable to rely on Defendant's representations when browsing the Website in the future absent an injunction that prohibits Defendant from making misrepresentations on the Website. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff is not a software developer and has not received training with respect to HTTP network calls.

## TOLLING

91. The delayed discovery rule applies to Plaintiff's claims. Plaintiff was unaware that even though he rejected all non-required cookies on the Website, Defendant caused cookies,

including the Third Parties' cookies, to be sent to his browsers, stored on his devices, and transmitted to the Third Parties along with his private user data until on or around June 20, 2023 when he learned of Defendant's privacy violations from his counsel. As alleged above, Plaintiff does not have the expertise to test whether the Website honored users' requests to opt out of cookies and tracking technologies.

92. On or about July 19, 2023, Plaintiff notified Defendant that he alleged that Defendant knowingly (and without consent) caused third-party cookies and corresponding data to be stored on consumers' devices and/or transmitted to third parties when they visit the Website despite consumers' clear rejection or declination of such third-party cookies. Plaintiff further notified Defendant that he intended to pursue his claims on behalf of himself and other similarly situated class members.

93. The Website's Terms of Use policy contains an arbitration agreement that purports to require all Website visitors to arbitrate their disputes with Defendant before the AAA.

94. Accordingly, on or about December 18, 2023, Plaintiff filed an arbitration demand against Defendant with the AAA, in which he provided Defendant with further notice of the claims asserted in this Complaint and his intent to pursue those claims on behalf of himself and other similarly situated class members.

95. The AAA issued a closing later (dated December 26, 2024), after the Arbitrator issued a final order/award (dated November 26, 2024) concluding: (a) Plaintiff did not waive his right to challenge arbitrability; (b) Plaintiff did not manifest consent to the agreement to arbitrate; (c) Plaintiff is not estopped from challenging arbitrability of the dispute; and (d) Plaintiff is not bound by the arbitration agreement. Exhibit A.

96. Despite exercising reasonable diligence, Plaintiff was unaware of Defendant's fraudulent and unlawful conduct alleged herein due to its active concealment of material facts, which prevented Plaintiff from discovering his claims within the statute of limitations. Further, Plaintiff's claims were equitably tolled by his demand letter and his filing of the arbitration proceeding because Defendant had notice of the claims (and Plaintiff's intent to pursue them in

court as a putative class action). Defendant was not prejudiced in its ability to gather evidence for Plaintiff's claims since his claims were substantially similar in the demand letter and arbitration proceeding to those asserted in this Complaint. These extraordinary circumstances, including Defendant's intentional misrepresentations and Plaintiff's pursuit of his claims in the arbitration proceeding, warrant tolling of the statute of limitations to allow Plaintiff to pursue his claims in this forum. Plaintiff acted in good faith and engaged in reasonable conduct in filing his Complaint in this action.

## CLASS ALLEGATIONS

97. Plaintiff brings this Class Action Complaint on behalf of himself and a proposed class of similarly situated persons, pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiff seeks to represent the following group of similarly situated persons, defined as follows:

**Class**: All persons who browsed the Website in the State of California after choosing to decline or reject all non-necessary cookies by adjusting the available settings to do so in the Website's Privacy Preference Center within the four years preceding the filing of this Complaint (the "Class Period").

98. This action has been brought and may properly be maintained as a class action against Defendant because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

99. **Numerosity:** Plaintiff does not know the exact size of the Class, but he estimates that it is composed of more than 100 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

100. **Common Questions Predominate:** This action involves common questions of law and fact to the Class because each class member's claim derives from the same unlawful conduct that led them to believe that Defendant would not cause third-party cookies to be placed on their browsers and devices and/or transmitted to third parties along with user data, after Class

members chose to decline or reject cookies and tracking technologies on the Website, nor would Defendant permit third parties to track and collect Class members' Private Communications as Class members browsed the Website.

101. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. The questions of law and fact common to the Class are:

a. Whether Defendant's actions violate California laws invoked herein; and

b. Whether Plaintiff and Class members are entitled to damages, restitution, injunctive and other equitable relief, reasonable attorneys' fees, prejudgment interest and costs of this suit.

102. **Typicality:** Plaintiff's claims are typical of the claims of the other members of the Class because, among other things, Plaintiff, like the other Class members, visited the Website, declined or rejected all cookies except those strictly necessary for the Website to function, and had his confidential Private Communications intercepted by the Third Parties.

103. **Adequacy of Representation:** Plaintiff will fairly and adequately protect the interests of all Class members because it is in his best interests to prosecute the claims alleged herein to obtain full compensation due to him for the unfair and illegal conduct of which he complains. Plaintiff also has no interests in conflict with, or antagonistic to, the interests of Class members. Plaintiff has retained highly competent and experienced class action attorneys to represent his interests and those of the Class. By prevailing on his claims, Plaintiff will establish Defendant's liability to all Class members. Plaintiff and his counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiff and counsel are aware of their fiduciary responsibilities to the Class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class members.

104. **Superiority:** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class

will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the Class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### First Cause of Action: Invasion of Privacy

105. Plaintiff realleges and incorporates the paragraphs of this Complaint as if set forth herein.

106. To plead an invasion of privacy claim, Plaintiff must show an invasion of (i) a legally protected privacy interest; (ii) where Plaintiff had a reasonable expectation of privacy in the circumstances; and (iii) conduct by Defendant constituting a serious invasion of privacy.

107. Defendant has intruded upon the following legally protected privacy interests of Plaintiff and Class members: (i) the California Invasion of Privacy Act, as alleged herein; (ii) the California Constitution, which guarantees Californians the right to privacy; (iii) the California Wiretap Acts as alleged herein; (iv) Cal. Penal Code § 484(a), which prohibits the knowing theft or defrauding of property "by any false or fraudulent representation or pretense;" and (v) Plaintiff's and Class members' Fourth Amendment right to privacy.

108. Plaintiff and Class members had a reasonable expectation of privacy under the circumstances, as Defendant affirmatively promised users they could decline or reject all cookies

and tracking technologies (except those strictly necessary for the Website to function) before proceeding to browse the Website. Plaintiff and other Class members directed their electronic devices to access the Website and, when presented with the popup cookies consent banner on the Website, Plaintiff and Class members declined or rejected all cookies except those strictly necessary for the Website to function and reasonably expected that his and their declination or rejection of all such cookies and tracking technologies would be honored. That is, he and they reasonably believed that Defendant would not permit the Third Parties to store and send cookies and/or use other such tracking technologies on their devices while they browsed the Website for purposes unnecessary to the Website's function. Plaintiff and Class members also reasonably expected that, if they declined or rejected all such cookies and/or tracking technologies, Defendant would not permit the Third Parties to track and collect Plaintiff's and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, on the Website.

109. Such information is "personal information" under California law, which defines personal information as including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement." Cal. Civ. Code § 1798.140.

110. Defendant, in violation of Plaintiff's and other Class members' reasonable expectation of privacy and without their consent, permits the Third Parties to use cookies and other tracking technologies to collect, track, and compile users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. The data that Defendant allowed third parties to collect enables the Third Parties to, *inter alia*, create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; create

audience segments based on shared traits (such as millennials, tech enthusiasts, etc.); and perform targeted advertising and marketing analytics. Further, the Third Parties share user data and/or the user profiles to unknown parties to further their financial gain. The consumer profiles are and can be used to further invade Plaintiff's and users' privacy, by allowing third parties to learn intimate details of their lives, and target them for advertising and other purposes, as described herein, thereby harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them.

111. Defendant's actions constituted a serious invasion of privacy in that it invaded a zone of privacy protected by the Fourth Amendment (i.e., one's personal communications), and violated criminal laws on wiretapping and invasion of privacy. These acts constitute an egregious breach of social norms that is highly offensive.

112. Defendant's intrusion into Plaintiff's privacy was also highly offensive to a reasonable person.

113. Defendant lacked a legitimate business interest in causing the placement and/or transmission of third-party cookies along with user data that allowed the Third Parties to track, intercept, receive, and collect Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, without their consent.

114. Plaintiff and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

115. Plaintiff and Class members seeks appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiff's and Class members' privacy.

116. Plaintiff and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiff and

Class members and made in conscious disregard of Plaintiff's and Class members' rights and Plaintiff's and Class members' declination or rejection of the Website's use of all cookies other than those strictly necessary for the Website to function. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**<u>Second Cause of Action</u>: Intrusion Upon Seclusion**

117. Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

118. To assert a claim for intrusion upon seclusion, Plaintiff must plead (i) that Defendant intentionally intruded into a place, conversation, or matter as to which Plaintiff had a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

119. By permitting third-party cookies to be stored on consumers' devices without consent, which enabled the Third Parties to track and collect Plaintiff's and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, in violation of Defendant's representations otherwise in the popup cookie consent banner, Defendant intentionally intruded upon the solitude or seclusion of Website users. Defendant effectively placed the Third Parties in the middle of communications to which they were not invited, welcomed, or authorized.

120. The Third Parties' tracking and collecting of Plaintiff's and Class member's Private Communications on the Website using third-party cookies that Defendant caused to be stored on users' devices—and to be transmitted to Third Parties—was not authorized by Plaintiff and Class members, and, in fact, those Website users specifically chose to decline or reject all cookies other than those strictly necessary for the Website to function.

121. Plaintiff and the Class members had an objectively reasonable expectation of privacy surrounding his and their Private Communications on the Website based on Defendant's promise that users could decline or reject all cookies other than those strictly necessary for the

Website to function, as well as state criminal and civil laws designed to protect individual privacy.

122. Defendant's intentional intrusion into Plaintiff's and other users' Private Communications would be highly offensive to a reasonable person given that Defendant represented that Website users could decline or reject all cookies other than those strictly necessary for the Website to function when, in fact, Defendant caused such third-party cookies to be stored on consumers' devices and browsers, and to be transmitted to third parties, even when consumers declined or rejected all such cookies. Indeed, Plaintiff and Class members reasonably expected, based on Defendant's false representations, that when he and they declined or rejected all cookies and tracking technologies except those strictly necessary for the Website to function, Defendant would not cause such third-party cookies to be stored on his and their devices or permit the Third Parties to obtain their Private Communications on the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

123. Defendant's conduct was intentional and intruded on Plaintiff's and users' Private Communications on the Website.

124. Plaintiff and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

125. Plaintiff and Class members seeks appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiff's and Class members' privacy.

126. Plaintiff and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiff and Class members and made in conscious disregard of Plaintiff's and Class members' rights and Plaintiff's and Class members' declination or rejection of the Website's use of all cookies other

than those strictly necessary for the Website to function. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**__Third Cause of Action__: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631)**

127. Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

128. California Penal Code § 631(a) provides, in pertinent part:

"Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars . . . ."

129. The California Supreme Court has repeatedly stated an "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line permits an outsider to tap his telephone or listen in on the call." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

130. Further, as the California Supreme Court has held, in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and *its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication— the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas*, 38 Cal. 3d at 360-61 (emphasis supplied; internal citations omitted).

131. CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under § 631(a), Plaintiff need only establish that Defendant, "by means of any machine, instrument, contrivance, or in any other manner," did ***any*** of the following:

> [i] Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system;
>
> [ii] Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state;
>
> [iii] Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained

Cal. Penal Code § 631(a).

132. CIPA § 631(a) also penalizes those who [iv] "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit" the wiretapping.

133. Defendant is a "person" within the meaning of California Penal Code § 631.

134. Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Bradley v. Google, Inc.*, 2006 WL 3798134, at *5–6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

135. The Third Parties' cookies—as well as the software code of the Third Parties responsible for placing the cookies and transmitting data from user devices to the Third Parties—constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA (and, even if they do not, Defendant's deliberate and purposeful scheme that facilitated the interceptions falls under the broad statutory catch-all category of "any other manner").

136. Each of the Third Parties is a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, the Third Parties had the capability to use the wiretapped information for

their own purposes and, as alleged above, they did in fact use the wiretapped information for their own business purposes. Accordingly, the Third Parties were third parties to any communication between Plaintiff and Class members, on the one hand, and Defendant, on the other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

137. Under § 631(a), Defendant must show it had the consent of all parties to a communication.

138. At all relevant times, the Website caused Plaintiff and Class members' browsers to store the Third Parties' cookies and to transmit those cookies alongside Private Communications—including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—to the Third Parties without Plaintiff's and Class members' consent. By configuring the Website in this manner, Defendant willfully aided, agreed with, employed, permitted, or otherwise enabled the Third Parties to wiretap Plaintiff and Class members using the Third Parties' cookies and to accomplish the wrongful conduct alleged herein.

139. At all relevant times, by their cookies and corresponding software code, the Third Parties willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiff and Class members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

140. The Private Communications of Plaintiff and Class members, on the one hand, and Defendant, on the other, that the Third Parties automatically intercepted directly communicates the Website user's affirmative decisions, actions, choices, preferences, and activities, which constitute the "contents" of electronic communications, including their browsing history, visit history, website interactions, user input data, demographic information,

interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

141. At all relevant times, the Third Parties used or attempted to use the Private Communications automatically intercepted by their cookie tracking technologies for their own purposes.

142. Plaintiff and Class members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiff's and Class members' electronic communications. Nor did Plaintiff and Class members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties' conduct. On the contrary, Plaintiff and Class members expressly declined to allow Third Parties' cookies and tracking technologies to access, intercept, read, learn, record, collect, and use Plaintiff's and Class members' electronic communications by choosing to decline or reject all cookies other than those strictly necessary for the Website to function through the options available in the Privacy Preference Center window.

143. The wiretapping of Plaintiff and Class members occurred in California, where Plaintiff and Class members accessed the Website and where the Third Parties—as enabled by Defendant—routed Plaintiff's and Class members' electronic communications to Third Parties' servers. Among other things, the cookies, as well as the software code responsible for placing the cookies and transmitting them and other Private Communications to the Third Parties, resided on Plaintiff's California-located device. In particular, the user's California-based device, after downloading the software code from the Third Parties' servers, (i) stored the code onto the user's disk; (ii) converted the code into machine-executable format; and (iii) executed the code, causing the transmission of data (including cookie data) to and from the Third Parties.

144. Plaintiff and Class members have suffered loss by reason of these violations, including, but not limited to, (i) violation of his and their right to privacy, (ii) loss of value in his and their Private Communications, (iii) damage to and loss of Plaintiff's and Class members'

property right to control the dissemination and use of their Private Communications, and (iv) loss of their Private Communications to the Third Parties with no consent.

145. Pursuant to California Penal Code § 637.2, Plaintiff and Class members have been injured by the violations of California Penal Code § 631, and each seeks statutory damages of the greater of $5,000, or three times the amount of actual damages, for each of Defendant's violations of CIPA § 631(a), as well as injunctive relief.

146. Unless enjoined, Defendant will continue to commit the illegal acts alleged herein including, but not limited to, permitting third parties to access, intercept, read, learn, record, collect, and use Plaintiff's and Class members' electronic Private Communications with Defendant. Plaintiff, Class members, and the general public continue to be at risk because Plaintiff, Class members, and the general public frequently use the internet to search for information and content related to fast food restaurants. Plaintiff, Class members, and the general public continue to desire to use the internet for that purpose. Plaintiff, Class members, and the general public have no practical way to know if his and their request to decline or reject cookies and tracking technologies will be honored and/or whether Defendant will permit third parties to access, intercept, read, learn, record, collect, and use Plaintiff's and Class members' electronic Private Communications with Defendant. Further, Defendant has already permitted the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiff's and Class members' electronic Private Communications with Defendant and will continue to do so unless and until enjoined.

**<u>Fourth Cause of Action</u>: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51)**

147. Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

148. The California Invasion of Privacy Act, codified at Cal. Penal Code §§ 630 to 638, includes the following statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

149. California Penal Code Section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

150. A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

151. The Third Parties' cookies and the corresponding software code installed by Defendant on its Website are each "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—including, the IP address and user-agent information—from the electronic communications transmitted by Plaintiff's and the Class's computers or devices. Cal. Penal Code § 638.50(b).

152. At all relevant times, Defendant caused the Third Parties' cookies and the corresponding software code—which are pen registers—to be placed on Plaintiff's and Class members' browsers and devices, and/or to be used to transmit Plaintiff's and Class members' IP address and user-agent information. *See Greenley v. Kochava,* 2023 WL 4833466, at *15-16 (S.D. Cal. July 27, 2023); *Shah v. Fandom, Inc.*, 2024 U.S. Dist. LEXIS 193032, at *5-11 (N.D. Cal. Oct. 21, 2024).

153. Some of the information collected by the Third Parties' cookies and the corresponding software, including IP addresses and user-agent information, does not constitute the content of Plaintiff's and the Class members' electronic communications with the Website. *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1008 (9th Cir. 2014). ("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…") (cleaned up).

154. Plaintiff and Class members did not provide their prior consent to Defendant's use of third-party cookies and the corresponding software. On the contrary, Plaintiff and the Class members informed Defendant that they did not consent to the Website's use of third-party

cookies by adjusting settings in the Privacy Preference Center window to decline or reject all cookies except those strictly necessary for the Website to function.

155. Defendant did not obtain a court order to install or use the third-party cookies and corresponding software to track and collect Plaintiff's and Class member's IP addresses and user-agent information.

156. As a direct and proximate result of Defendant's conduct, Plaintiff and Class members suffered losses and were damaged in an amount to be determined at trial.

157. Pursuant to Penal Code § 637.2(a)(1), Plaintiff and Class members are also entitled to statutory damages of $5,000 for each of Defendant's violations of § 638.51(a).

**Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation**

158. Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

159. Defendant fraudulently and deceptively informed Plaintiff and Class members that he and they could decline or reject all cookies except those strictly necessary for the Website to function.

160. However, despite Defendant's representations otherwise, Defendant caused third-party cookies and software code to be stored on consumers' devices, and to be transmitted to the Third Parties alongside Private Communications, even after users adjusted settings in the Privacy Preference Center window to decline or reject all cookies except those strictly necessary for the Website to function. These cookies and corresponding software code allowed the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiff's and Class members' Private Communications, even when consumers had previously chosen to decline or reject all such cookies.

161. These misrepresentations and omissions were known exclusively to, and actively concealed by Defendant, not reasonably known to Plaintiff and Class members, and material at the time they were made. Defendant knew, or should have known, how the Website functioned, including the Third Party's resources it installed on the Website and the third-party cookies in use on the Website, through testing the Website, evaluating its performance metrics by means of

its accounts with the Third Parties, or otherwise, and knew, or should have known, that the Website's programming allowed the third-party cookies to be placed on users'—including Plaintiff's—browsers and devices and/or transmitted to the Third Parties along with users' Private Communications even after users attempted to decline or reject all cookies other than those strictly necessary for the Website to function, which Defendant promised its users they could do. Defendant's misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiff and Class members as to whether to use the Website. In misleading Plaintiff and Class members and not so informing him and them, Defendant breached its duty to Plaintiff and Class members. Defendant also gained financially from, and as a result of, its breach.

162. Plaintiff and Class members relied to their detriment on Defendant's misrepresentations and fraudulent omissions.

163. Plaintiff and Class members have suffered an injury-in-fact, including the loss of money and/or property, as a result of Defendant's unfair, deceptive, and/or unlawful practices, including the unauthorized interception of his and their Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, which have value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Plaintiff and Class members have also suffered harm in the form of diminution of the value of his and their private and personally identifiable information and communications.

164. Defendant's actions caused damage to and loss of Plaintiff's and Class members' property right to control the dissemination and use of their personal information and communications.

165. Defendant's representation that consumers could decline or reject all cookies other than those strictly necessary for the Website to function (including cookies used to "analyze site usage[] and assist in [Defendant's] marketing efforts") if they adjusted the settings to do so

was untrue. Again, had Plaintiff and Class members known these facts, they would not have used the Website. Moreover, Plaintiff and Class members reviewed the popup cookie consent banner, Privacy Preference Center window, and Privacy Statement prior to their interactions with the Website. Had Defendant disclosed that it caused third-party cookies to be stored on Website visitors' devices that are not necessary to the Website's functionality and are instead related to analytics and advertising and/or share information with third parties even after they choose to decline or reject all such cookies, Plaintiff and Class members would have noticed it and would not have interacted with the Website.

166. By and through such fraud, deceit, misrepresentations and/or omissions, Defendant intended to induce Plaintiff and Class members to alter their positions to their detriment. Specifically, Defendant fraudulently and deceptively induced Plaintiff and Class members to, without limitation, use the Website under the mistaken belief that Defendant would not permit third parties to obtain users' Private Communications when consumers chose to decline or reject all cookies other than those strictly necessary for the Website to function. As a result, Plaintiff and the Class provided more personal data than they would have otherwise.

167. Plaintiff and Class members justifiably and reasonably relied on Defendant's misrepresentations and omissions, and, accordingly, were damaged by Defendant's conduct.

168. As a direct and proximate result of Defendant's misrepresentations and/or omissions, Plaintiff and Class members have suffered damages, as alleged above, and are entitled to just compensation, including monetary damages.

169. Plaintiff and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiff and Class members and made in conscious disregard of Plaintiff's and Class members' rights and Plaintiff's and Class members' declination or rejection of the Website's use of all cookies other than those strictly necessary for the Website to function. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**<u>Sixth Cause of Action</u>: Unjust Enrichment**

170. Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

171. Defendant created and implemented a scheme to increase its own profits through a pervasive pattern of false statements and fraudulent omissions.

172. Defendant was unjustly enriched as a result of its wrongful conduct, including through its misrepresentation that users could decline or reject all cookies other than those strictly necessary for the Website to function and by permitting the Third Parties to store and transmit cookies on Plaintiff's and Class members' devices and browsers, which permitted the Third Parties to track and collect users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, even after Class members declined or rejected such cookies.

173. Plaintiff and Class members' Private Communications have conferred an economic benefit on Defendant.

174. Defendant has been unjustly enriched at the expense of Plaintiff and Class members, and Defendant has unjustly retained the benefits of its unlawful and wrongful conduct.

175. Defendant appreciated, recognized, and chose to accept the monetary benefits that Plaintiff and Class members conferred onto Defendant at his and their detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of Plaintiff and Class members.

176. It would be unjust for Defendant to retain the value of Plaintiff's and Class members' property and any profits earned thereon.

177. There is no justification for Defendant's enrichment. It would be inequitable, unconscionable, and unjust for Defendant to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct.

178. Plaintiff and Class members are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiff and Class members to the

position he and they occupied prior to having his and their Private Communications tracked and collected by the Third Parties.

179. Plaintiff pleads this claim separately, as well as in the alternative, to his other claims, as without such claims Plaintiff would have no adequate legal remedy.

**<u>Seventh Cause of Action</u>: Trespass to Chattels**

180. Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

181. Defendant, intentionally and without consent or other legal justification, caused cookies to be stored on Plaintiff's and Class members' browsers and devices, which enabled the Third Parties and Defendant to track and collect Plaintiff's and Class members' Private Communications and use the data collected for their own advantage, as described above.

182. Defendant was unjustly enriched as a result of its wrongful conduct, including through its misrepresentation that users could decline or reject all cookies and tracking technologies other than those strictly necessary for the Website to function, and through their failure to disclose that Defendant causes non-necessary third-party cookies to be stored on consumers' devices and browsers, which cause the Third Parties to track and collect Plaintiff's and Class members' Private Communications even after consumers chose to decline or reject such cookies.

183. Defendant intentionally caused third party software code to be stored onto Plaintiff's and Class members' devices, knowing that the code would be executed by those devices. The software code then placed and/or transmitted cookies along with Plaintiff's and Class members' Private Communications to the Third Parties. These intentional acts interfered with Plaintiff's and Class members' use of the following personal property owned, leased, or controlled by Plaintiff and other users: (a) his and their computers and other electronic devices; and (b) his and their personally identifiable information.

184. Defendant's trespass of Plaintiff's and other users' computing devices resulted in harm to Plaintiff and other users and caused Plaintiff and other users the following damages:

a. Nominal damages for trespass;

b. Reduction of storage, disk space, and performance of Plaintiff's and other users' computing devices; and

c. Loss of value of Plaintiff's and other users' computing devices.

**PRAYER FOR RELIEF**

**WHEREFORE**, reserving all rights, Plaintiff on behalf of himself and the Class members, respectfully requests judgment against Defendant as follows:

A. Confirmation of the arbitral award;

B. Certification of the proposed Class, including appointment of Plaintiff's counsel as class counsel;

C. An award of compensatory damages, including statutory damages where available, to Plaintiff and Class members against Defendant for all damages sustained as a result of Defendant's wrongdoing, including both pre- and post-judgment interest thereon;

D. An award of punitive damages;

E. An award of nominal damages;

F. An order for full restitution;

G. An order requiring Defendant to disgorge revenues and profits wrongfully obtained;

H. An order temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

I. For reasonable attorneys' fees and the costs of suit incurred; and

J. For such further relief as may be just and proper.

Dated: April 4, 2025

///

**GUTRIDE SAFIER LLP**

*/s/Seth A. Safier/s/*
Seth A. Safier (State Bar No. 197427)
seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
todd@gutridesafier.com
Kali R. Backer (State Bar No. 342492)
kali@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

*Attorneys for Plaintiff*